AO 106 (Rev. 04/10) Application for a Search Warrant

# UNITED STATES DISTRICT COURT

for the
District of Oregon

FILED 14 JAN '19 11:55 USDC-ORP

In the Matter of the Search of
*(Briefly describe the property to be searched
or identify the person by name and address)*

13957 SW Ronald Court, Beaverton, OR 97006, et. al,
as described in Attachment A

)
)
)
)
)
)

Case No. '19-MC- 22 (A-D)

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

The locations as described in Attachment A

located in the _____ District of _____ Oregon _____, there is now concealed *(identify the person or describe the property to be seized)*:

The information and items set forth in Attachment B hereto.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☑ contraband, fruits of crime, or other items illegally possessed;

☑ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. §§ 2, 371, 1952, 2421 | Conspiracy to use a facility in interstate commerce with intent to promote acts to facilitate the promotion and carrying of a business enterprise involving prostitution and transporting an individual in interstate commerce for purposes of prostitution. |

The application is based on these facts:
See affidavit of FBI Special Agent June Piniewski which is attached hereto and incorporated herein by this reference.

☑ Continued on the attached sheet.

☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

*Applicant's signature*

June Piniewski, FBI Special Agent
*Printed name and title*

Sworn to before me and signed in my presence.

Date: _____01/13/2019_____

*Judge's signature*

City and state: Portland, Oregon

Hon. John V. Acosta, United States Magistrate Judge
*Printed name and title*

**DISTRICT OF OREGON, ss:**                **AFFIDAVIT OF JUNE PINIEWSKI**

## AFFIDAVIT IN SUPPORT OF SEARCH WARRANT

I, June Piniewski, being duly sworn, hereby depose and state as follows:

### Introduction and Agent Background

1.      I am a Special Agent of the United States Department of Justice, Federal Bureau

of Investigation (FBI), and have been so employed since February 2015.   As a Special Agent of

the FBI, I am authorized to investigate violations of the criminal laws set forth in Title 18 of the

United States Code.   I am currently assigned to the Portland Division of the FBI where I

investigate violations of federal law, including bank robberies, crimes against children, sex

trafficking offenses, and other violent crimes.   I have been involved in multiple investigations of

matters involving sex trafficking, particularly as it relates to violations of 18 U.S.C. §§ 1591,

1952, 2421, and 2423.   I have had extensive training in law enforcement investigation

techniques, including but not limited to 800 hours of training at the FBI's Academy at Quantico,

Virginia.   Prior to joining the FBI, I was a Deputy Sheriff in Hillsborough County, Florida, for

approximately five years, where I participated in the investigation of various crimes, including

violent crimes.

2.      As a Special Agent of the FBI, I am authorized to investigate violations of the

criminal laws set forth in Title 18 of the United States Code.   I am currently assigned to the

Portland Division of the FBI where I investigate violations of federal law, including bank

robberies, crimes against children, sex trafficking offenses, and other violent crimes.

3.      This affidavit is submitted in support of an application under Rule 41 of the

Federal Rules of Criminal Procedure for a search warrant for the following premises:

- *13957 SW Ronald Court, Beaverton, OR (Location 1).*

- *1030 SW Jefferson Avenue, Apartment 340, Portland, OR (Location 2).*

- *410 NW Lost Springs Terrace, Apartment 108, Portland, OR (Location 3).*

- *13309 SW 72nd Avenue, Apartment 1D, Tigard, OR (Location 4).*

for contraband and evidence, fruits, and instrumentalities of violations of Title 18, United States

Code, Section §§ 2, 371, 1952, and 2421.   As set forth below, I have probable cause to believe

that such property and items, as set forth in Attachment B, which is attached hereto and

incorporated herein by this reference, including any digital devices or electronic storage media,

are currently on the premises located above, more fully described in Attachment A, which is also

attached hereto and incorporated herein by this reference.

4.      The statements contained in this affidavit are based upon the following: my own

personal knowledge; knowledge obtained from other individuals during my participation in this

investigation, including other law enforcement officers; interviews of witnesses; my review of

records related to this investigation; communications with others who have knowledge of the

events and circumstances described herein; and information gained through my training and

experience.   Because this affidavit is submitted for the limited purpose of establishing probable

cause in support of the search warrant application, it does not set forth each and every fact that I

or others have learned during the course of this investigation.

5.      I have set forth only those facts that I believe are necessary to establish probable

cause to believe that evidence of violations of 18 U.S.C. §§ 2, 371, 1952, and 2421, exists on the

person of Ting Fu and ChaoDan Wang, and at the residences, located at:

- *13957 SW Ronald Court, Beaverton, OR (Location 1)*

- *1030 SW Jefferson Avenue, Apartment 340, Portland, OR (Location 2)*

- *410 NW Lost Springs Terrace, Apartment 108, Portland, OR (Location 3)*

- *13309 SW 72nd Avenue, Apartment 1D, Tigard, OR (Location 4)*

## **Applicable Law**

6.      Title 18, United States Code, Section 1952(a)(3) makes it a crime to knowingly use a facility in interstate or foreign commerce, specifically computers and cellular telephones, with intent to promote, manage, establish, and carry on acts to facilitate the promotion, management, establishment, and carrying on of an unlawful activity namely, a business enterprise involving prostitution offenses in violation of the laws of the State in which they are committed, to-wit prostitution in violation of Oregon Revised Statute (ORS) 167.007 and of the United States, and thereafter performed and attempted to perform an act to promote, manage, establish, and carry on and to facilitate the promotion, management, establishment, and carrying on of such unlawful activity; Title 18, United States Code, Section 2421 makes it a federal felony for anyone to knowingly transport an individual in interstate or foreign commerce, with the intent that such individual engage in prostitution, or in any sexual activity for which any person can be charged with a criminal offense, or attempts to do so.   Title 18, United States Code, Section 371, makes it a crime for two or more persons to conspire to commit any offense against the United States and for one or more of the people to do any act to effect the object of the conspiracy.   Title 18, United States Code, Section 2 provides that whoever commits an offense against the United States or aids, abets, counsels, commands, induces or procures it commission is punishable as a principal.

## STATEMENT OF PROBABLE CAUSE

### Sex Trafficking

7.     I have received formal and on-the-job training in the investigation of sex

trafficking.   I have participated in several investigations, which led to the arrest and conviction

of traffickers, and have become familiar with the habits, mannerisms, language, and techniques

used in committing human trafficking offenses, and the attempts to conceal the evidence of such

occurrences from detection by both the public at large and law enforcement agencies.   I have

spoken with and read documentation by officers who possess knowledge and expertise in the

investigation of sex trafficking-related crimes.   I have spoken to numerous victims of sex

trafficking about their experiences in the life of prostitution.   I have also participated in many

aspects of sex trafficking investigations, including conducting physical surveillance, interviews,

reviewing electronic evidence, using confidential human sources, writing and executing search

and seizure warrants, and making arrests.   I have gained knowledge of the inner working of Sex

Trafficking Organizations (STOs) and based on my training and experience know the following:

8.     Prostitution is inherently a cash business, as cash provides paying customers with

some form of anonymity.   STOs often move and launder the cash by placing it into it into bank

accounts, using casinos to launder sources of cash, wire transfers, store value credit/debit cards,

online e-currency, investment accounts, real estate, cash-based businesses such as restaurants,

and other types of assets.   STOs will often move the illegal proceeds several times through

different forms of assets to make it difficult for law enforcement to discover the true source of

the funds.   STOs will often open legitimate businesses or have legitimate employment to

launder the illegal proceeds and comingle these illegal funds with legitimate income from the

**Page 4 – Affidavit of June Piniewski**                    **USAO Version Rev. April 2017**

business or employment, to prevent law enforcement from discovering the true source of the

proceeds.

9.       Websites such as, www.backpage.com,[1] www.adultsearch.com,

www.supermatchescort.com, wwww.portlandasianescort.com and others are often used by STOs

to advertise commercial sex services.   I know that STOs will often advertise their services as

"massages" or "escorts" in an attempt to avoid detection by law enforcement.   The term "escort"

is widely used as a euphemism for prostitution.   I know that a legitimate "escort" is hired for an

extended period of time such as several hours and even days.   An "escort" is expected to be

attractive and presentable in public.   They are often used to stand-in as a date for specific

functions or entertainment for an evening.   "Escorts" are paid for their time and their company

and sexual favors are not included as part of their package.   Legitimate "escorts" or "massage"

in an attempt parlors do not list coded language for the services they provide such as: GFE

(Girlfriend Experience) or BBJ (Bare Blowjob).   I also know that legitimate "escorts" or

"massage" parlors do not typically advertise services posting sexually provocative photographs

or by providing age, height or the weight of the person providing the massage.   Legitimate

"escort" and "massage" businesses typically do not operate from a motel room paid on a day-by-

day basis, nor from an apartment.   I also know legitimate "escorts" and "masseuses" do not

perform sexual acts on their customers and therefore do not provide condoms or wear lingerie

when interacting with the customer.

---

[1]       On April 6, 2018, www.backpage.com (a classified ad website) and affiliated websites
were seized and shut down by the United States Federal Government due to their promotion of
sex trafficking and prostitution.

**Page 5 – Affidavit of June Piniewski**                    **USAO Version Rev. April 2017**

10.     The STOs post on-line ads for "escorts" or "massages" that investigators recognize as prostitution-related advertisements.   The investigation has revealed the following roles within a STO:

    a.     *Customers* – men who pay money for sexual acts.

    b.     *Providers* – individuals who perform sex acts for money.

    c.     *Drivers* – individuals who transport the providers and perform other activities, such as: collecting proceeds, delivering food and other supplies.

    d.     *Leasee* – individuals who lease the apartments that are used as brothels.

    e.     *Dispatcher* – individuals who answer the calls/texts/emails (responses to ads) from the customers and sets up "dates" within the computer and notifies the provider.

    f.     *Boss* – a supervisor of one or more brothel locations.

11.     Through this investigation, I have learned how STOs manage operations of the online ads.   When a customer responds to the ad and calls the number associated with the ad, they are connected to "dispatch."   Dispatch identifies the location of the customer and assigns the customer to a specific provider (someone who performs sex acts for money) for a "date" (an encounter for the purposes of engaging in a commercial sex act with the women).   Dispatch then notifies the provider that a "date" has been set.

12.     STOs arrange apartments and hotels for the provider to stay in and use for engaging in acts of prostitution.   As part of the investigation, law enforcement has conducted over twenty undercover sting operations in Portland, Oregon, targeting Asian "escort" ads.   In these sting operations, an undercover officer sets up a "date" using the contact phone number

provided in the ad.    After confirming the date and obtaining an address through the STO

dispatch, the undercover officer is told to notify dispatch when they have arrived.    Once the

undercover has arrived, dispatch will provide the motel room number or apartment number.

13.    Once inside the apartment, investigators notice very little furniture and that the

bedroom in the apartment appears to be only used for sex acts.    Investigators rarely see a

bedframe and often the mattress has just a sheet with a towel laid on top.    The nightstands next

to the bed usually have multiple unused condoms on or near them, towels, and various bottles of

oils and lubricants.    The clothing in the closets or in the suitcases consist of mainly of lingerie.

14.    The STOs recruit women to work as providers from their respective countries

(generally China or other Asian countries) and the women generally speak very little English.

Some providers have indicated they are engaging in prostitution to pay back certain costs, such

as the cost of coming to the United States.

### Chen STO

15.    For the past two years, I have been investigating sex trafficking, mainly focused

on Asian STOs.    As the investigation unfolded, I learned multiple agencies (both local and

federal) across the country have encountered Asian STOs.    My investigation revealed multiple

Asian STOs, the main one of which is an international sex trafficking organization (hereafter

referred to as the "Chen STO") operating throughout the United States, Canada, and Australia.

The following are some of the known subjects in the current investigation:

a.    ***Zongtao Chen, a.k.a "Mark" Chen*** – Chen is suspected of being the main

facilitator for an Asian STO operating in the United States, Canada, and Australia. Chen is

suspected of facilitating and coordinating the interstate and foreign travel of women, primarily

**Page 7 – Affidavit of June Piniewski**                    **USAO Version Rev. April 2017**

Chinese national females ("CNFs"), for criminal sexual activity, and of using online websites such as "supermatchescort.com" to promote prostitution.

   b.  ***Yan Wang, a.k.a. "Sarah" Wang*** –Wang is suspected of acting as dispatch for the Chen STO by setting up "dates" for the CNF to engage in prostitution.

   c.  ***Weixuan Zhou*** – Zhou is suspected of facilitating and recruiting CNFs in China and North America to work as prostitutes and of financing voluminous amounts of prostitution-related advertisements and domains.

   d.  ***Ting Fu*** – Fu is suspected of being a boss and managing multiple brothels in the state of Oregon.

   16.  Between June 16, 2016 and July 10, 2016, the FBI received approximately 19 anonymous tips submitted to Crime Stoppers of Oregon that identified Zongtao Chen, as a facilitator for an Asian STO operating in Canada and the United States. Chen is specifically named as the renter of several hotels and condominiums used by the STO in the United States and Canada.

   17.  One tip on June 16, 2016, read,

> International prostitution ring operating in Portland.   When will you shut down this operator?   They offer unprotected sex acts. 1,000's of people are at health risk.   Hotels and short term condo rentals is the way they do business.   Mark Chen from Toronto may have a hand in the condo part of the business.   He is a real estate broker.   Advertisement today in Backpage: *Portland Asian Escort* Best Asian student *New Kelly 34DD*-19. Come to enjoy the best Asian experience, new Kelly, 19, 34DD, 100lbs, she will rock your world.   Portland Downtown in call 503-850-2545 or 647-687-7096, WeChat: aa585466383 www.nyasianangels.com.

   18.  Another tip received on June 23, 2016, read,

> Some tips for the international prostitution ring operating in your
> city: Mark Chen is a real estate broker from Toronto.   Leader?
> Tenant Name: Zong Tao Chen (aka Mark Chen) Contact Phone
> Number 416-732-4321.   Numbers used: WeChat: aa5854660383,
> call or text: 206-866-6735, call or text: 323-498-1660 347-594-
> 5090, call or text: 503-850-2545 520-433-9310…..

with several other phone numbers and addresses listed.

### Online Presence of the STO

19.      The Chen STO uses www.supermatchescort.com as their main website to post

online prostitution-related advertisements.   The "supermatchescort.com" website displays

multiple pictures of Asian women posing in a provocative manner, often wearing lingerie or

bikinis.   The "supermatchescort.com" website has a menu listing their "supermatch girls", the

rates charged, a description of the site, a way to contact the site to set up "dates", employment, a

press room, and the "girls in your city."   Many of the advertisements also provide a description,

using coded language such as BBJ (Bare Blowjob), GFE (Girl Friend Experience – prostitution

acts involving kissing) of the prostitution-related services they offer.   The

"supermatchescort.com" website also links to an email address, supermatchescort@gmail.com, a

phone number, and a WeChat contact, which allows individuals to directly contact the site and is

used to carry out the criminal activities of the organization.   (See Image A listed below as well

as Attached Video 1, which is a December 2018 law enforcement generated video showing how

an individual can navigate through the "supermatchescort.com" site).   This site is still active as

of January 13, 2019.



Image A

20. The "supermatchescort.com" website directly services the following areas:

Albuquerque, NM; Anaheim, CA; Atlanta, GA; Augusta, GA; Austin, TX; Bakersfield, CA;

Beaverton, OR; Bellevue, WA; Bismarck, ND; Brisbane, Australia; Calgary, Canada; Camarillo,

CA; Cincinnati, OH; Dallas, TX; Denver, CO; Des Moines, IA; Detroit, MI; Edmonton, Canada;

Fairfax, VA; Fargo, ND; Fort Collins, CO; Fort Wayne, IN; Grand Junction, CO; Grand Rapids,

MI; Green Bay, WI; Halifax, Canada; Houston, TX; Inglewood, CA; Kansas City, MO; Los

Angeles, CA; Madison, WI; Melbourne, Australia; Milwaukie, WI; Minneapolis, MN; Minot,

ND; New York, NY; Newark, CA; Niagara Falls, Canada; Oakland, CA; Odessa, TX; Oklahoma

City, OK; Ontario, Canada; Palmdale, CA; Philadelphia PA; Portland, OR; Provo, UT; Red

Reed, Canada; Renton, WA; Sacramento, CA; Salt Lake City, UT; San Diego, CA; Seattle, WA;

Sioux Falls, SD; South Bend, IN; Spokane, WA; Springfield, MO; St. Paul, MN; Sydney,

Australia; Tacoma, WA; Toronto, Canada; Tucson, AZ; Warwick, RI; Williston, ND; Windsor,

Canada; Winnipeg, Canada; and Yakima, WA.

21.    On the main page of the website "supermatchescort.com", it reads, "about us," and then below reads, "Super Match Escort, arrange you to meet with our professional Massages. They come from many different backgrounds.   They are happy and fun to be accompanying with, let our Massages bring you the total enjoyment of life."   The advertisements are arranged by city.   (See Image B).



Image B

22.    A majority of the cities have a secondary website that can be accessed from the "supermatchescort.com" website.   When you click on "Portland, OR," you are directed to providers available within Portland, OR.   Each provider's listings contain a link titled "Portland Asian Escort," which will redirect you to the website, "portlandasianescort.com." (see Attached Video 1, listed above, for a reference to each city).

23.    One of the listings for Portland, OR was for "Asian Sophia" and read as follows:

Asian Sophia
Beaverton/Tigard/Airport
503-765-9147 or 6362872242
Incall/outcall 24/7
<u>PORTLAND ASIAN ESCORT</u>
Portland Escort Young, pretty, sexy

(See Image C).



24.     I know from my training and experience that "Incall/Outcall" are common terms

used in prostitution advertisements.    "Incall" is where the customer comes to the provider's

location and "Outcall" is where the provider goes to the customer's location.

25.     On the website, www.portlandasianescort.com, the homepage states,

Portland Asian Escort Tel: 503-765-9147 or 6362872242,
WeChat:aa5854660383, 24 Hrs Service Portland Escorts Service –
Portland Asian Escort Agencies – Female Escorts Service Portland
Welcome to the gold standard of Portland Escort Services.   We

offers the best selection of Portland Escorts at the best price imaginable.   Our Escort Girls are amongst the most beautiful, charming and fun ladies in Portland.

(See Image D).



Image D

26.     One advertisement on the Portland website states the following on the photograph of an Asian female, "Shower Together, Bbj-kissing-69 Style, Young, Pretty, Sweet, Wet Tight Pussy, Licking-sucking-touching, Girlfriend Experience everything u want."

27.     Based on my experience, I know Bbj is a common term used among prostitution related ads to mean Bare blow job which is oral sex without a condom.   I also know 69 is a common term for an inverted sexual position where simultaneous oral sex occurs.

28.     The email address under the contact portion of this website is supermatchescort@gmail.com.   (See Image E).

Image E



29.     On or about March 19, 2018, a Grand Jury subpoena return from Google for

subscriber information related to the email address supermatchescort@gmail.com identified the

subscriber's name as Zongtao Chen, with a recovery email of markzongtaochen@gmail.com and

a phone number of 416-732-4321.   Through subpoena returns and a search of law enforcement

databases, I discovered other emails linked to Chen: markztchen@yahoo.ca,

markzongtaochen@gmail.com, and chen_zong_tao@hotmail.com.

### Customs and Border Patrol (CBP) contact with Chen

30.     According to a report written by CBP Officer Baker, on May 12, 2016 the

Alexandria Bay, (New York point of entry) encountered an Ontario registered vehicle bearing

tag BMMK280.   Zong Tao Chen was seeking entry to visit his alleged girlfriend in New York,

NY for three days.   Chen was referred to a secondary inspection where he was interviewed by

CBP Officer Barkley.   The following is a summary of the interview with Chen:

**Page 14 – Affidavit of June Piniewski**          **USAO Version Rev. April 2017**

Chen stated he was a self-employed website designer and worked from home. He spent approximately three weeks in the United States on his last visit and returned home to Unionville, Ontario for three days to see his children and other friends.    During the interview, Chen received numerous calls and messages on his cell phone.    It was further discovered Chen was carrying the following: two cell phones, his wallet and papers related to a CTBC Bank account opened by Chen.    The CTBC Bank paperwork was for a wire transfer in the amount of $30,000 USD from Chen to Rui Li.    Chen stated Rui Li was his ex-wife.    The paperwork showed Chen had a total balance of $49,490 in the CTBC Bank in NY account.    The wallet contained several credit cards in his name as well as several business cards for banks in the New York City area.

Chen's Samsung Galaxy S5 was viewed and many images were found of Asian females posing provocatively.    The phone also contained photos and related images that were consistent with advertisements relating to prostitution/escorts. Chen initially denied that he was operating or posting ads for escorts via the internet. The messages within the cell phone lists identified the owner as Mark C. Chen initially stated Mark C was a friend of his and later stated in the interview that he is actually Mark C. Chen stated he could not remember the address of his girlfriend even though he just spent three weeks with her in NYC. Chen later admitted that he posts ads for escorts on Backpage.com and several other websites.    Chen also stated he handles the calls and arranges the dates.    Chen initially said he only received $1 to $1.50 per ad for posting the ads, but later admitted that he actually received between eight and ten percent of the money the escort made from her date.    Chen also stated that he sometimes arranges drivers for the girls. CBP observed that Chen was very evasive during the interview and repeatedly asked the same questions in order to get an answer.

## **Email Returns for Hotmail Email Address**

### *Information showing chen_zong_tao@hotmail.com belongs to Mark Chen*

31.    A search warrant return from Hotmail for the content of the email address chen_zong_tao@hotmail.com demonstrates that Mark Chen used the email address for personal use, including documenting the U.S. addresses he used, presumably for bank cards. (See Image F).

**Subject:** Bank card address
**From:** zong_tao <chen_zong_tao@hotmail.com>
**Date:** 2/25/2017 11:28 PM
**To:** zong_tao <chen_zong_tao@hotmail.com>

Image F



32.    Another email displays a picture of Mark, which image is consistent with the appearance of the Mark Chen indicted in this case:   (See Image G)

Image G



*Hotmail email address linked to other emails, including supermatchescort@gmail.com*

33.    The warrant return showed that the Hotmail email address received emails from "Zongtao Chen" using the email address supermatchescort@gmail.com with two 5-digit numbers and the website escorts-canada.com in the subject line.   (See Image H).   This type of message lacking details and context is consistent with the same person using both email addresses.

| Image H |

**Subject:** http://www.escorts-canada.com
**From:** Zongtao Chen <supermatchescort@gmail.com>
**Date:** 4/7/2018 2:10 PM
**To:** zong_tao <chen_zong_tao@hotmail.com>

22442
**22445**

34.    The Hotmail email address also received email messages from its own email address with a prostitution-related website in the subject and body of the message.   I later learned that Mark Chen suggested another STO use this website to advertise prostitution services.

**Subject:** skipthegames.com
**From:** zong_tao <chen_zong_tao@hotmail.com>
**Date:** 2/27/2017 3:09 AM
**To:** zong_tao <Chen_zong_tao@hotmail.com>

skipthegames.com

35.    The Hotmail address also received an email from markzongtaochen@gmail.com with the subject "email account" and body text "my email," which may indicate he wanted to keep track of which email addresses he had set up for himself.   (See Image I).

**Subject:** email account
**From:** Zongtao Chen <markzongtaochen@gmail.com>
**Date:** 12/15/2016 5:56 PM
**To:** "chen_zong_tao@hotmail.com" <chen_zong_tao@hotmail.com>

Image I

my email

36.     Another email, which was sent to the Hotmail address from

supermatchescorts@gmail.com, appears to be several examples in English for responses to men

looking for dates.   The responses contain what appears to be the addresses of brothels or hotels

used as brothels in different cities across the United States and Canada.    (See Image J).

**Subject:** address
**From:** Zongtao Chen <supermatchescort@gmail.com>
**Date:** 12/16/2016 7:57 AM
**To:** chen_zong_tao@hotmail.com

Image J

add2.txt

Hi hun, I am at Commons inn - 5780 West St, Halifax, NS .... what time will you come?

Hi hun, I am at 550 S Florence St, Wichita 67209.. what time will you come?

Hi hun. I am at Residence & Conference Centre - Ottawa Downtown  - 150 Hazel st,
Ottawa K1S 5T8(1c5). what time is good for you?

Hi hun, I am at 1828 S Wentworth Ave, Chicago IL 60616-4955. what time will you come
hun? 140hh 180 h
Hi hun, I am at 3160 West 8th St, Los Angeles, 90005 - Palga Grand hotel.. what time
will you come?

Hi hun, I am working at 4950 s outlet center dr, Tucson, az 85706,... what time is
good for you?

Hi hun. nice asian at 10160 114 st nw, edmonton. what time is good for you? 140hh 240
1h 100qv

I am working at 10320 45 Ave NW, Edmonton. what time is good for you?

37.     In numerous undercover operations, some of which are outlined later in the

affidavit, after law enforcement officers would contact the number from an escort advertisement,

**Page 18 – Affidavit of June Piniewski**                    **USAO Version Rev. April 2017**

law enforcement would receive a message addressed to "Hi hun" in a response similar to those above.

***Travel records/money transfers***

38.    The Hotmail email search warrant also revealed numerous emails containing records of money transfers from individuals with Asian female names to Chen, some of which I know are involved in the Chen STO.    I summarized the transaction details obtained from those emails, in part, below.    (See Image K).

| Image K | | |
|---|---|---|

| Transaction Date | Name | Transaction Amount |
|---|---|---|
| 6/17/2018 | Meihua Zhuang | $350 |
| 6/3/2018 | Meihua Zhuang | $1,000 |
| 6/1/2018 | Meihua Zhuang | $680 |
| 5/30/2018 | Meihua Zhuang | $510 |
| 5/26/2018 | Meihua Zhuang | $300 |
| 5/23/2018 | | |
| 5/19/2018 | Meihua Zhuang | $710 |
| 5/15/2018 | Meihua Zhuang | $500 |
| 4/30/2018 | Ting Fu | $1,500 |
| 4/19/2018 | Ting Fu | $1,000 |
| 4/3/2018 | Lu Chen | $614 |
| 2/18/2018 | Ting Fu | $1,125 |
| 2/23/2018 | Li Hong | $500 |
| 2/14/2018 | Li Hong | $1,000 |
| 2/10/2018 | Ting Fu | $1 |
| 2/8/2018 | Ting Fu | $1,000 |
| 2/2/2018 | Lu Chen | $30 |
| 2/3/2018 | Ting Fu | $500 |
| 2/3/2018 | Lu Chen | $170 |
| 2/2/2018 | Lu Chen | $30 |
| 2/2/2018 | Lu Chen | $200 |
| 2/1/2018 | Lu Chen | $100 |
| 1/31/2018 | Lu Chen | $70 |
| 1/30/2018 | Lu Chen | $110 |
| 1/28/2018 | Ting Fu | $300 |
| 1/27/2018 | Ting Fu | $250 |
| 1/27/2018 | Ting Fu | $1 |
| 1/24/2018 | Wei-Yen Hsu | $280 |
| 1/18/2018 | Wei-Yen Hsu | $1,000 |
| 1/16/2018 | Wei-Yen Hsu | $1,000 |
| 1/12/2018 | Wei-Yen Hsu | $1,000 |
| 1/9/2018 | Wei-Yen Hsu | $800 |
| 1/2/2018 | Wei-Yen Hsu | $100 |
| 12/28/2017 | Meihua Zhuang | $180 |
| 12/27/2017 | Wei-Yen Hsu | $500 |
| 12/27/2017 | Meihua Zhuang | $120 |
| 12/26/2017 | Wei-Yen Hsu | $295 |

39.     Of note, this investigation identified Lu Chen as a provider out of Sioux Falls, South Dakota, as detailed later in this affidavit.    Ting Fu has also been identified as a boss, managing multiple locations here in Portland, Oregon.

### Hotels Booked

40.     The Hotmail email search warrant also revealed numerous emails containing hotel reservations for individuals with Asian female names, one of which I later identified as a provider.    I summarized the reservation details obtained from those emails, in part, below. (See Image L).

| | Jun-18 | NAME | HOTEL | ADDRESS OF HOTEL |
|---|---|---|---|---|
| | 3rd-5th | Chia-Chi Yu | Candlewood Suites | 2601 Abbott Plaza, omaha, NE 68110 |
| | 3rd-5th | Yen-Yi Su | Comfort Inn & Suites | 4822 East Washington Avenue, Madison, WI 53704 |
| | 6th-8th | Yen-Yi Su | Rodeway inn & Suites | 4400 S 27th Street, Milwaukee, WI 53221 |
| | 6th-10th | Kwai C Wong | Microtel Inn & Suites | 801 East 78th Street, Bloomington, MN 55420 |
| | May-18 | NAME | HOTEL | ADDRESS OF HOTEL |
| | 10th-12th | Chia-Chi Yu | America's Best Value Inn | 754 Horizon Drive, Grand Junction, CO 81506 |
| | 12th-14th | Jianhong Li | Baymont | 120 W University Dr, Mishawaka, IN 46545 |
| | 13-15 | Mei-Huan Chen | Microtel Inn & Suites | 3820 4th Avenue West, Williston, ND |
| | 14-16 | Ke Cheng | Clarion Inn & Suites | 3370 East Battlefield Road, Springfield, MO 65804 |
| | 15-18 | Mei-Huan Chen | Home Place Lodge & Suites | 1505 15th Avenue West, Williston, ND 58801 |
| | 18-20 | Yen-Yi Su | Super 8 | 5253 South Howell Avenue, Milwaukee, WI 53207 |
| | 18-20 | Chia-Yin Chang | Days Inn | 1964 University Avenue West, Saint Paul, MN 55104 |
| | 18-20 | Kwai C Wong | Ramada by Wyndham | 407 Lyons Avenue, Sioux Falls, SD 57106 |
| | 22-24 | Hong-Qin Wang | Extended Stay America | 245 West Natick Road, Warwick, RI 02886 |
| | 24-26 | Hong-Qin Wang | Extended Stay America | 3747 29th Street South East, Grand Rapids, MI 49512 |
| | 24-26 | Lixia Zha | Ramada by Wyndham | 5601 Fortune Circle West, Indiapolis, IN 46241 |
| | 26-28 | Yanping Zhou | America's Best Value Inn | 754 Horizon Drive, Grand Junction, CO 81506 |
| | 26-28 | Lixia Zha | America's Best Value Inn | 3401 South Keystone Avenue, Indianapolis, IN 46237 |
| | 26-28 | Yimin Liang | Comfort Inn & Suites | 4822 East Washington Avenue, Madison WI 53704 |
| | 26-28 | Lixia Zha | Americas Best Value Inn | 3401 South Keystone Avenue, Indianapolis, IN 46237 |
| | 28-30 | Qirong Yuan | Motel 6 | 20 Jefferson Blvd, Warwick, RI 02888 |
| | Aug-17 | NAME | HOTEL | ADDRESS OF HOTEL |
| | 10th-13th | Jianhong Li | Extended Stay America | 7956 Lyndale Avenue S., Bloomington, MN 55420 |
| | 15th-17th | Youchun Xiong | Portland Travelodge | 1200 Brighton Avenue, Portland, ME 04102 |
| | 17th-18th | Youchun Xiong | Motel 6 | 1 Riverside St, Portland, ME 04103 |
| | 2nd-4th | Hong Chen | Quality Inn South Bluff | 1165 S Bluff Street, St. George, UT 84770 |
| | Oct-17 | NAME | HOTEL | ADDRESS OF HOTEL |
| | 2nd-4th | Hong Chen | Quality Inn South Bluff | 1165 S Bluff Street, St. George, UT 84770 |

Image L

41.    I also found numerous emails sent to Mark Chen requesting a rating or review of

hotel stays across the United States, made in the names of Asian females.    (See Image M).

| | DATE OF EMAIL | NAME | HOTEL WITH CITY |
|---|---|---|---|
| Image M | 4/19/2018 | Li-Lun | Hawthorne Suites, Williston |
| | 3/27/2018 | Min Luo | Woodspring Suites, Sioux Falls |
| | 3/19/2018 | Min Luo | Comfort Suites, Sioux Falls |
| | 5/2/2018 | Fang | Baymont by Wyndham, Grand Forks |
| | 5/15/2018 | Hong-Qin Wang | Hawthorne Suites, Fargo |
| | 7/1/2017 | Jianhong Li | Red Roof Inn, Rockford |
| | 7/27/2017 | Jianhong Li | Microtel Inn & Suites Bloomington Minneapolis |
| | 8/9/2017 | Jianhong Li | Motel 6, St Paul I-94 |

***Transportation Booked***

42.    In the Hotmail email search returns, I discovered numerous flight reservations

which appear to be made in the names of Asian females.    Some of the names used in the flight

reservations correspond to names used for hotel reservations.    I summarized the flight details

obtained from those emails, in part, below.    (See Image N).

| | 2017 NAME | AIRLINE | DEPARTURE/ARRIVAL |
|---|---|---|---|
| | 11/1/2017 Xinrong Zhao | Delta | San Jose CA/Salt Lake City |
| | 9/19/2017 Ying Luan | WestJet | Montreal/Calgary |
| Image N | 9/15/2017 Ying Luan | WestJet | Halifax/Calgary |
| | 8/11/2017 Youchun Xiong | Delta | Milwaukee/Los Angeles |
| | 8/22/2017 Youchun Xiong | American Airlines | Boston/Chicago |
| | 7/9/2017 Youchun Xiong | Delta | Portland OR/Tucson |
| | 7/15/2017 Youchun Xiong | Delta | Tucson/Atlanta |
| | 5/19/2017 Hongqin | Delta | Bismarck ND/NYC |
| | 5/18/2017 Yen Yi | Delta | NYC/Chicago |
| | 4/18/2017 Yu-Tai Hsu, Chi-Ling Hsu | Spirit | Minneapolis/Los Angeles |
| | 2018 NAME | AIRLINE | DEPARTURE/ARRIVAL |
| | 7-Jun Mei-huan Chen | United | Salt Lake City/Denver |
| | 18-May Chiayin Chang | Spirit | Los Angeles/Minneapolis |
| | 8-May Ke Cheng | Spirit | Los Angeles/Kansas City |
| | 14-Jan Hongbo Wang | Jetblue | Los Angeles/NYC |

**Page 21 – Affidavit of June Piniewski**                    **USAO Version Rev. April 2017**

43.     I also found several reservations for Greyhound Bus travel to and from destinations the Chen STO uses for prostitution operations, with the exception of Bend, Oregon. I summarized the bus details obtained from those emails below.    (See Image O).    Of note, one of the reservations specifically referenced billing "Zongtao," which I believe is a reference to billing Mark Chen.

| | DATE | NAME | DEPARTURE/ARRIVAL | |
|---|---|---|---|---|
| Image O | 6/18/2018 | Chia-Chi Yu | Sioux Falls/Fargo | |
| | 6/6/2018 | Kwai C Wong | Sioux Falls/Minneapolis | |
| | 7/29/2017 | Kwai C Wong | Las Vegas/St George | |
| | 7/31/2017 | Kwai C Wong | St George/Provo | |
| | 2/25/2017 | Xin Hong Liu | Portland OR/Bend | |
| | 12/30/2016 | Chunling Hou | Toronto/Ottawa | Billed to Zongtao |

## WeChat and CHS

44.     The Chen STO uses a mobile application called, "WeChat," to communicate, advertise, and send money.   WeChat is a Chinese multi-purpose messaging, social media, and mobile payment application.   WeChat provides text messaging, hold-to-talk voice messaging, broadcast (one-to-many) messaging, video calls and conferencing, video games, sharing of photographs and videos, and location sharing.   It can exchange contacts with people nearby via Bluetooth.   Users can send previously saved or live pictures and videos, name cards of other users, coupons, or current GPS locations with friends either individually or in a group chat. WeChat users can set up a WeChat account by entering their phone number and then their Username or ID.   Users can customize their profile by adding a profile image, which is displayed during a conversation.

45.     WeChat users who have provided bank account information may use the application to pay bills, order goods and services, transfer money to other users, and pay in stores if the stores have WeChat payment options. Users can link their Chinese bank accounts, as well as Visa, MasterCard and Japan Credit Bureau.   WeChat Pay is a digital wallet service incorporated into WeChat, which allows users to perform mobile payments and send money between contacts. Although users receive immediate notification of the transaction, the WeChat Pay system is not an instant payment instrument, because the funds transferred between counterparties is not immediate.   Every WeChat user has their own WeChat Payment account. Users can acquire a balance by linking their WeChat account to their debit card, or by receiving money from other users. Users who link their credit card can only make payments to vendors, and cannot use this to top up WeChat balance. WeChat Pay can be used for digital payments.

46.     A Confidential Human Source ("CHS"), who I have met with and whose true identity I know, came to the attention of the FBI from an investigation conducted by Homeland Security Investigations (HSI), Omaha Division.   This investigation involved a STO, different from the Chen STO, using Extended Stay motels for prostitution.   One of the subjects within their investigation was the CHS.   The CHS, who speaks Mandarin Chinese, worked within the STO and organized the hotels and "dates" for the providers in exchange for a portion of the money collected from the commercial sex acts.   The CHS agreed to cooperate in the investigation of others involved in criminal activity in the hopes of future consideration.   The CHS has no formal charges pending.   The CHS has previously been arrested for a few misdemeanor prostitution charges and one felony prostitution-related charge.

**Page 23 – Affidavit of June Piniewski**                    **USAO Version Rev. April 2017**

47.     On May 31, 2018, I met with the CHS who told me that a man named Mark, later identified as Mark Chen, has several brothels in multiple cities across the United States and Canada.   In 2018, while working as a dispatcher for an unrelated STO, the CHS contacted Mark via WeChat to see if he would help find work for the providers.   During this conversation, Mark suggested certain cities where the CHS's providers could work and the expected number of customers available daily in these locations.

48.     Also on May 31, 2018, the CHS directed me to website, "ca.51."   The website was mainly in Chinese, but at the top left was the word, "Canada" in English.   In the middle of the website was a picture of an Asian male with glasses and next to the picture it read, "Mark Chen, Sales Representative, Re/Max Realtron Realty, Inc."   The CHS identified this photograph as the man she knows as "Mark."   This picture shows the same person as the one in the Hotmail email address photo referenced above.   The website also listed phone number 416-732-4321 and email address markztchen@yahoo.ca.   An FBI linguist translated the webpage and further discovered next to the name "Mark Chen" it stated, "Chen Zong Tao."

49.     The CHS then navigated to Mark's WeChat contact card in the CHS's phone. Mark's contact card contained a profile image of a red, orange, and yellow flower.   There were two phone numbers listed for this contact: 416-732-4321 and 347-594-5090.

50.     The CHS said that "Mark" texted her the following websites to use to post advertisements for prostitution: www.adultsearch.com, www.skipthegames.com, and www.adlist24.com.   While working as a dispatcher, the CHS learned that "Mark" also uses the website "supermatchescort.com" to advertise providers who are involved in prostitution.

51.    On May 31, 2018, the CHS, in my presence, navigated to a group conversation within WeChat. Within the group chat was the profile image of a red/orange and yellow flower, which was the same WeChat image the CHS showed me for 'Mark."    In the conversation next to the flower profile image was an advertisement.    The advertisement was translated as, "Sincerely hiring/requesting female phone operator who knows computers, patient, hardworking, responsible, contact via WeChat." (See Image P).



52.    The CHS explained that each brothel location (apartment and/or hotel) that Mark operates has a separate WeChat group.    Within each group, a dispatcher is also paired up with a provider.

### CHS and Yan Wang

53.    The CHS identified one of Mark's WeChat groups, which is associated with a brothel operating out of a hotel in Omaha, Nebraska.    This WeChat group contains ten different

people.   Each person has their own profile image.   This Omaha WeChat group includes Mark's

profile image.   (See Image Q).



54.      The CHS stated that Mark monitors the numerous WeChat groups associated with

the STO.   The CHS stated that, Yan Wang, a friend of theirs, who lives in the Los Angeles area

is currently working as a dispatcher for "Mark."   The CHS identified Wang's WeChat profile

image within the Omaha group.   The CHS worked as a dispatcher in 2017 with Wang in

California for a different STO.   While working as dispatchers, the CHS and Wang shared the

same Apple iCloud and Store accounts.   The email address that was associated to the Apple

iCloud account was "redmoon9d@gmail.com."   The CHS learned that, as of September 2018,

Wang no longer uses that iCloud account because Wang believes it is not safe and someone

might find out where she is located.

**Page 26 – Affidavit of June Piniewski**                    **USAO Version Rev. April 2017**

55.    On June 27, 2018, the CHS provided a screenshot of a photo of a silver Mazda bearing California tag 8AIV928.   The CHS identified this vehicle as Wang's.   The photograph has a time stamp of May 11 5:54 p.m.

56.    I know through a search of law enforcement databases the following about Yan Wang: subscribes to phone numbers (562) 988-4830 and (891) 653-1911, registered vehicle 2012 Mazda bearing California tag 8AIV928, address on W 12th Street, Pomona, California.

57.    On April 30, 2018, a cash withdrawal of $300.00 was made from Wang's husband's Wells Fargo account ending in x1033.   Bank surveillance footage showed Yan Wang at the drive thru ATM (located at the Wells Fargo at 32881 U.S. Highway 79, Temecula, CA, 92592) in a Mazda vehicle with license plate number 8AIV928.   Wang is not a co-signer on her husband's account. (see Image R and S)



Transaction
ATM/Teller ID: 9943Y
Type: 2
Sequence: 6986
Cashline: 00
Card Number: XXXXXXXXXXX6405
Date: 04/30/2018
Time: 08:51:53
Mapped: yes

Image R



Appliance: AU 75420 Butterfield Station
Camera: 11, C11 ATM 9943Y Cust
Time: 04/30/2018 8:52:03 AM

Image S

58.    Between April 10, 2018, and June 26, 2018, twelve transactions were captured on bank surveillance footage for Bank of America account ending in x5100.    Both Gotti Cheng and Yan Wang are signors on this account.    Eleven of the twelve transactions were cash deposits totaling $8,600.00.    The other transaction was a $500.00 cash withdrawal on April 25, 2018. On this date, bank surveillance footage showed both Gotti Cheng and Yan Wang at a Bank of America teller window.    Also on April, 25, 2018, two online banking transfers occurred that transferred $640.00 from Yan Wang's Bank of America account ending in x3255 to the joint account at Bank of America ending in x5100. (see image T and U)



Image T



Image U

### Folkspost – Chen STO's Online Scheduling Site

59.     On July 3, 2018, the CHS provided a photograph s/he received via the iCloud account shared with Wang.   I reviewed the picture, which was screenshot of a conversation that occurred on June 5, 2018, between Yan Wang and Mark Chen.   In this screenshot, Mark sends the following to Wang, "folkspost.com/appt, User: lover, and Password: 6362872242."   Wang replies with a screenshot of a color-coded calendar.   At the top of the calendar it reads, "Folkspost Online…."   The CHS said that "Mark's" dispatchers use a computer to answer the

customers' phone calls and then enters the "dates."   This was a copy of the calendar listing the dates.

60.     On July 13, 2018, I executed a search warrant to Apple for the iCloud account: "redmoon9d@gmail.com" (the email address linked to the iCloud account).   On July 24, 2018, Apple returned the search warrant results.   Within the iCloud pictures folder was a screenshot of a text message between Wang and Chen.   This screenshot was the same as the screenshot mentioned in the above paragraph.

61.     Also within the pictures folder is an image of a screenshot with the main webpage, www.folkspost.com displayed.   Within that webpage the year "2012" appears and a space to log in with a username and password.

### *Search Warrant Returns*

62.     In September 2018, I obtained a search warrant for the information contained on "folkspost.com" and executed the warrant on the server hosting company DreamHost/CT Corporation.   From these returns, which I received on December 4, 2018, and the CHS information, I learned that the Chen STO uses "folkspost.com" as an online booking system, mainly used by the dispatchers and Mark.   I learned that the database operates as a calendaring system.   The image below shows an overview of the calendar of "dates" for 2018.   (See Image V and Attached Video 2 for an overview of the website).[2]

---

[2]     Attached Video 2, which was created by law enforcement from the search warrant results, shows how an individual can navigate through the folkspost.com site.



63.    The image below shows the dates for the first week of April 2018.    (See Image W).



64.     Within the system, a user can sort the data by year, month, day, or a specific

provider.   The website also contains a drop down menu to allow searching by Country (US,

Canada, Australia)/City (varying by Country).   (See Image X).

Image X



65.    The booking system also contains a "client" database, which appears to contain

the customer's phone numbers.    The client database is "searchable" by phone numbers.    The

client's phone number and number of visits are listed.    (See Image Y).

Image Y

66.    Each date is color coded and viewed in the calendar as such: the time, the customer's phone number, the city, the provider, and the dispatcher.   (See Image Z).



Image Z

67.     After the date is made, it is the dispatcher's responsibility to notify the provider,

usually via the WeChat group.

### Direct association between WeChat, Folkspost, and Mark Chen

68.     According to a Sioux Falls Police Department report, on April 18, 2018, an

employee of a hotel in the area of W 34th Street and S Carolyn Avenue contacted the Sioux Falls

Police Department.   The employee told the officers they believed the customer in room 406 was

engaging in prostitution.   The employee stated several men a day were visiting the room for less

than an hour and the customer has paid for their room with cash.

69.     On April 23, 2018, the Street Crime Unit was working in an undercover capacity

and targeting on-line advertisements that they know, from their experience, are often used to

advertise acts of prostitution.   The undercover officer sent a text message to the number listed in

the ad asking if he would be able to come see her (the escort posted in the ad).   The phone

number listed in the advertisement gave the same address to the hotel and stated their rates were

$150 for a half hour (hh) and $200 for an hour (h).   Just as the undercover officers were about to

go to room 406, one of the officers witnessed a male knock on the door of room 406 and enter at

7:51 p.m.   The male exited the room at 8:01 p.m. and entered his vehicle.   The officers

conducted a traffic stop on that vehicle and learned: the male inside the vehicle found an

advertisement on "adultsearch.com" and contacted the phone number listed in the advertisement

using his phone.   The man's phone number was (605) 359-4990.   The officers observed a

strand of text messages starting at 6:51 p.m.   The male sent a text message to the phone number

listed in the advertisement.   The phone number responded, "Yes hon hi hon I am at 2725 South

Carolyn Avenue, Sioux Falls, South Dakota 57106.   150 hh 200h no black gentleman please.

What time is good for you honest?"   The male scheduled a "date" for 7:45 p.m.   When the male

stated he had arrived he received a text that said, "Room 406 come in now."   He stated that he

received a "happy ending" after his massage.   When asked what he meant by a "happy ending"

he stated a "hand job."   A "hand job" is a common term used by people to describe the manual

stimulation of a man's penis until ejaculation.   The male admitted to paying the woman inside

room 406, $150.00.   He stated once he gave the woman (an Asian female) the $150.00, he took

off all his clothes and laid on the bed.   He received a back massage for a little while and then

rolled over and got a hand job.

70.     The undercover officers entered room 406, identified the Asian female as Lu

Chen and interviewed her.   During the interview they learned the following: while using

WeChat, Lu Chen saw ads recruiting women for work.   She reached out to one of the ads and

began speaking to an individual she called Zongtao Chen.   She frequently referred to him as an

"owner."   Zongtao Chen told her to come to Sioux Falls and to report to a specific hotel.   Once

at the hotel, she said "operators" (dispatchers) began setting up "dates" for her and sending men

to her room.   She did not know any of the name of the "operators."   She showed the officers the

WeChat group "Sioux Falls 406."   She sent portions of her income to Zongtao Chen.   For

example, if she received $150.00 from a customer for a half hour, she would pay Zongtao Chen

$50; if she makes $200.00, she would send Zongtao Chen $80.00.   She said she normally pays

**Page 36 – Affidavit of June Piniewski**                    **USAO Version Rev. April 2017**

Zongtao Chen by contacting her sister in China and instructing her to pay Zongtao Chen in Chinese money.   A couple times, she has transferred Zongtao Chen money through her Wells Fargo Bank account.

71.    She showed officers Zongtao Chen's email address: chen_zong_tao@hotmail.com and a phone number of 416-732-4321.   The search warrant returns of Mark Chen's Hotmail email revealed emails documenting multiple wire transfers from Lu Chen to Mark Chen.

72.    A review of Lu Chen's WeChat conversations revealed the following:

73.    In one group that read "Sioux Falls 406," the beginning of the conversation appears to start with names I recognized as being also users/dispatchers in "folkspost.com": "juskson", "ferxio", "japer." (Compare Image AA (WeChat message) and Image BB (folkspost calendar).

Image AA



Dispatchers



Image BB

74.    I also observed another WeChat conversation between Lu Chen and Zongtao Chen which revealed the following:    On March 10, 2018, Zongtao Chen provides Lu Chen the Days Inn hotel in St Paul, Minneapolis.    (See Image CC).    Then on March 21, 2018, he provides his phone number, "416-732-4321" and the hotel "My Place hotels fargo" with an address of "2555 55th St, Fargo, ND 58104."    (See Image DD).    It is my understanding that he was asking Lu Chen to travel to these cities and hotels to engage in prostitution.



75.   Subsequently, on March 26, 2018 Zongtao Chen sends the following: (See Image EE)

First name: zongtao
Last name: chen
Country: Canada
Phone: 4167324321



76.   A review of the "folkspost.com" returns revealed that on April 23, 2018, the same day as the undercover operation in Sioux Falls, a date was entered into the calendar from "7:30-

**Page 39 – Affidavit of June Piniewski**                    **USAO Version Rev. April 2017**

8:00 p.m., Sioux Fall – Jenny (faith)."   The phone number within that appointment was (605) 359-4990, which is the same number as belonged to the man who was interviewed after he left the hotel room.   (See Image FF).



Image FF

### Online Presence – Subject Domain Names

### *Seattle Backpage Investigation – Weixuan Zhou's Involvement in STOs*

77.    In 2016, FBI Seattle Division was investigating STOs and suspected from reports and records that Weixan Zhou was a principal facilitator in a Chinese STO that was recruiting Chinese women in China and North America to work as prostitutes in the United States, and Canada.   Seattle FBI determined the following:

a.    Zhou was financing voluminous amounts of prostitution-related Backpage advertisements through the US and Canada.   Zhou purchased airline

tickets for Chinese females who had been arrested for prostitution and received money in the form of cash deposits into his bank account and through Western Union wires.

b.  A Washington state search warrant was served on Backpage for any and all records associated with the two phone numbers related to ads involving undercover prostitution stings in June 2014, and all other ads that identified as being likely related based upon similarities in grammar, formatting, and language.   Backpage's returns showed that all the ads were purchased by four individuals all using the same e-mail account, which was angelnetadvertisement@hotmail.com.   The individuals who purchased these ads included Zhou.   Most of the IP addresses associated with this email account in communication with Backpage were either from the city of Guangzhou, Guangdong, China or from the province of Ontario, Canada.   Subsequent Backpage records also showed that Zhou was operating in the Western District of Washington, across the United States, and in Canada and other countries.

c.  The Backpage ads obtained were dated from November 2012 through February 2016.   The requests for Backpage records had been based upon specific known phone numbers used in Backpage ads, or based upon subject names, or e-mail addresses. Approximately 86,000 unique ads have been collected. Of these ads, approximately 78,000 were purchased by users using the e-mail address of angelnetadvertisement@hotmail.com

(or a derivative that has "re" or "tor" added).   The cost of these ads totaled approximately $843,000.

d.    The Backpage data also revealed that ads were being placed for cities all across the United States.   Seattle, Houston, Dallas, and the San Francisco area had over 5,000 ads each in that three-year period.   Chicago was the next largest city in terms of ad volume.

e.    Financial records obtained for Zhou show that in 2014 alone, Zhou spent approximately $432,500 on Backpage ads (Wells Fargo credit card ending in 4578). Zhou's mother, Xiaolin Chen spent approximately $111,596 on Backpage ads from approximately January 2015 to June 2015.

f.    A search for domain names registered to Zhou revealed that he has registered domain names that also reference the e-mail address bata_intl@hotmail.com and rastait_mz@hotmail.com.   Lunarpages was the host of these web sites.   Records from Lunarpages were obtained, and they revealed that Lunarpages hosted 228 web sites.   Of these sites, 227 were paid for by a credit card issued to Xiaolin Chen (Zhou's mother). Investigation determined that of these 227 sites, 147 were still active as of March 2016.   One of the sites, Lunarpages listed as being paid for by Zhou using the e-mail address of bata_intl@hotmail.com.   This particular site appeared to be related to a bike parts business.   These sites, with the exception of the site financed by Zhou, were as follows: (see Image H)

*Subject Domain Names in Chen STO*

78.     In the current, Portland-based investigation, I have found approximately 300

active websites that I believe the Chen STO uses or has used as online solicitations for Asian

prostitution.   Of the 300, approximately twenty-five of the domains are hyperlinked within the

"supermatchescort.com" website and associated to the email supermatchescort@gmail.com. (See

Image HH, a compilation of some of the 300 homepages)



79.     On or about November 2018, the FBI accessed publicly available information on

twenty-five domains associated with the email address supermatchescort@gmail.com.     The

domains were queried through Domaintools (an open source tool), which queries the following:

WHOIS records, passive Domain Name Service (DNS) data, IP addresses, hosting data, and other DNS information.    (See Image II, the twenty-five domain names).    This information revealed that the twenty-five domains were hosted on IP 64.50.176.48, along with a significant number of other domains.   Hundreds of these domains appeared to have been registered to Weixuan Zhou through Domain.com, LLC, with historical registrant email information identified as bata_intl@hotmail.com or rastait_mz@hotmail.com.[3]

| Image II | www.supermatchescort.com | www.saltlakecityasianescort.com |
| | www.asianescrotsatlanta.com | www.sandiegoasianescort.com |
| | www.dallasescortasian.com | www.seattleasianescorts.com |
| | www.denverescortasian.com | www.siouxfallsasianescort.com |
| | www.fargoasianescort.com | www.tacomaasianescort.com |
| | www.fortcollinsasianescort.com | www.tucsonasianescort.com |
| | www.kansasasianescort.com | www.providenceasianescort.com |
| | www.laasianescort.com | www.calgaryasianescort.com |
| | www.milwaukeeasianescort.com | www.torontoescortsasian.com |
| | www.minneapolisasianescort.com | www.edmontonasianescort.com |
| | www.nyescortasian.com | www.melbourneescortss.com |
| | www.oaklandasianescort.com | www.sydneyasianescorts.com |
| | www.portlandasianescort.com | |

80.    Grand Jury subpoena records and returns from Domain.com revealed that for all twenty-five domain names, the subscriber was Weixuan Zhou, with an email address of rastait_mz@hotmail.com, a telephone number of 213-431-0920.   The billing information for this account was as follows:   Card holder name: Weixuan Zhou; Billing Address: ti yu lu no. 613 Guang Zhou, China.

81.    Credit card activity shows Weixuan Zhou paying Domain.com for these domains from August 2012 to June 2018.   Financial records for Zhou, from August 16, 2012 through June 1, 2018, show payments made via credit card to Domain.com totaling $11,202.04.   One specific example shows that Zhou's Wells Fargo credit card made multiple payments to

---

[3]    As of January 2019, several of these domains are now set to resolve to IP 64.50.169.107.

Domain.com in September 2014.   This credit card's September 2014 balance was paid down from Weixuan Zhou's Wells Fargo checking account.   The source of these funds originated from cash deposits at banks in Texas, Colorado, Oregon, Washington, and California.

82.     On October 26, 2018, a Grand Jury subpoena return to PayPal showed that beginning on or around February 15, 2018, and occurring through October 10, 2018, the PayPal account linked to rastait_mz@hotmail.com sent 147 transactions totaling $6,150.14 to Domain.com.   The subpoena return also showed on or around January 31, 2016, through September 2017, the PayPal account linked to bata_intl@hotmail.com sent 169 transactions totaling $10, 241.74 to Domain.com.   The total payments sent to Domain.com from Zhou's two PayPal accounts were approximately $16,391.88.

83.     Lunarpages.com, a hosting service provider located in California, provided the registration information for IP address 64.50.176.48, which is where supermatchescort.com and others are hosted.   The Lunarpages.com information showed that the associated domain name for the IP address server is angelnethost.com, the account owner is Weixuan Zhou, user name angell65, email address rastait_mz@hotmail.com, address tian xing bie lu no.106, Shang Hai, China.

84.     On or about March 1, 2017, Zongtao Chen's Bank of America checking account ending in x9683 made a purchase of $77.70 to Lunarpages Webhost.   On or about March 9, 2017, this amount was returned to the same bank account.

## Chen STO presence in Portland, Oregon

85.    During this investigation, we have identified multiple locations which are being

used as brothels along with locations that are associated to members of the Chen STO.    The

locations are as follows:

### Location 1

### 13957 Ronald Court, Beaverton, OR

86.    On March 6, 2018, Portland Police Bureau (PPB) Officer Mike Gallagher was

targeting on-line advertisements that we know, from our experience, are often used to advertise

acts of prostitution.    Officer Gallagher found an ad that was titled "503-616-3617*Portland

Asian Escort*Young Asian best service team*New Erica 34DD*."    The body of the ad stated:

> "503-616-3617 Portland Asian Escort
> 22 53 34dd. 100lbs
> Best service ever, she will rock your world
> Call/text: 503-616-3617 or 503-850-2545
> Wechat: aa5854660383

87.    Officer Gallagher sent a text message to the number listed in the ad asking if he

would be able to come see her (the escort posted in the ad).    Officer Gallagher received the

response, "hi hun I am at 13285 SW Hawks Beard St, Tigard, Oregon 97223…140/hh 180/h NO

Black gentlemen Plz what time is good for you honey?"    We recognized the reference to

"140hh" and "180hh" to be common prostitution references referring to charging the customer

$140 for a half-hour and $180 for an hour to be with the provider.    Once Officer Gallagher

texted he arrived, the number responded, "Sygnii apt, drive building 8 room 812."    I know

"Portland Asian Escort" and the WeChat ID "aa5854660383" is used by the Chen STO to

**Page 46 – Affidavit of June Piniewski**                    **USAO Version Rev. April 2017**

coordinate his prostitution related business and we have seen this in multiple Chen STO

advertisements.   After the date was scheduled, we did not follow through with it.

88.    On March 27, 2018, a Grand Jury subpoena return from the Syngii Apartments,

13285 SW Hawks Beard St, Tigard, Oregon, for the records of all the information associated

with the lease agreement for 13285 SW Hawks Beard St, Apartment 812 Tigard, Oregon

revealed the following:

> Resident Name: Ting Fu
> Phone Number: 678-216-9756
> Previous Address: 8412 NW 8th Street Miami, FL 33126

89.    On or about May 21, 2018, Portland Police Bureau (PPB) Officer Mike Gallagher

again targeted on-line advertisements that we know, from our experience, are often used to

advertise acts of prostitution.   Officer Gallagher found an ad that was titled "503-616-

3617*Portland Asian Escort*Young Asian best service team*New Erica 34DD*."   The body of

the ad stated:

> "503-616-3617 Portland Asian Escort
> 22 53 34dd. 100lbs
> Best service ever, she will rock your world
> Call/text: 503-616-3617 or 503-850-2545
> Wechat: aa5854660383

Officer Gallagher sent a text message to the number listed in the ad asking if he would be able to

come see her (the escort posted in the ad).   Officer Gallagher received the response, "hi hun I

am at 8364 SW Pfaffle Street, Portland, Oregon 97223…140hh 180h NO Black gentlemen Plz

what time is good for you honey?"   We recognized the reference to "140hh" and "180hh" to be

common prostitution references referring to charging the customer $140 for a half-hour and $180

for an hour to be with the provider as above.

**Page 47 – Affidavit of June Piniewski**                    **USAO Version Rev. April 2017**

90.     On May 21, 2018, I spoke with the property manager from the Carriage House

Apartments, at 8364 SW Pfaffle Street, Portland, Oregon.   During the conversation I learned

that the property management crew and her noted several different men frequenting 8364 SW

Pfaffle Street apartment 109 on a daily basis.   I provided her with my card.

91.     On or about May 23, 2018, I received an email from a property manager from the

Carriage House Apartments.   The manager advised that they received anonymous mail which

contained a letter, a copy of an advertisement, and a copy of a text message conversation:

> *Just a heads-up, but you have Chinese prostitutes working in your apartment now.*
> *I suspect they just took out the lease recently.   But you definitely want to get rid*
> *of them ASAP.   Talk with Building Management people at: Willow Grove*
> *Apartments 11981 SW Center Street, Beaverton, Oregon 97005 Phone: 503-626-*
> *6325 Or Syngii Apartments 13435 SW Hawks Beard Street Tigard, 97223 503-*
> *926-6385.   They had the same problem.   You will have men coming and going*
> *all day, and not good people.*

92.     An enclosed copy of an Asian ad from the website, www.adultsearch.com, under

the Portland, Oregon Female Escorts Section read as such:

> Asian Jenny – (503) 765-9147
> Portland, Oregon Female Escort Portland Asian Escort 503-765-9147
> Phone: 503-765-9147
> Email: supermatchescort@gmail.com
> Website: http://www.portlandasianescort.com

93.     An enclosed copy of the text message showed a conversation to 503-765-9147

which read:

> "hi hun I am at 8364 SW Pfaffle St, Portland OR 97223…140hh 180h NO Black
> gentlemen Plz what time is good for you honey?"

94.     On June 19, 2018, a Grand Jury subpoena return from the Carriage House

Apartments, for the records of all the information associated with the lease agreement for 8364

SW Pfaffle St, Apartment 109 Portland OR 97223 revealed the following:

**Page 48 – Affidavit of June Piniewski**          **USAO Version Rev. April 2017**

Resident Name: ChaoDan Wang
Phone Number: 503-875-9755
Vehicle: GMC Arcadia California tag 7VMN764

95.     On September 26, 2018, I was notified by the Carriage House Apartment manager
that their maintenance staff needed to do a walk-through of 8364 SW Pfaffle Street, Apartment
109, Tigard, Oregon 97223.   The on-site manager provided the tenant(s) of apartment 109 a 24-
hour legal entrance notice.

96.     On September 27, 2018, at approximately 11:00 a.m., with the permission of the
on-site manager, I attended a walk-through of 8364 SW Pfaffle Street, Apartment 109, Tigard,
Oregon 97223 with one of the maintenance staff.   When he knocked on the door, an Asian
female wearing a robe and slippers answered the door.   The maintenance staff explained why
we were there.   The Asian female stated she didn't speak English and then proceeded to call
someone several times.   After explaining again the purpose of being there, the Asian female told
us to come in.   Inside the apartment were two bedrooms and two bathrooms with minimal
furniture and no lights on.   One bedroom was bare besides a couple of empty shopping bags.
The other bedroom had a box spring on the floor with the mattress on top.   A towel was laid on
top of the mattress sheet and next to the mattress was a plastic drawer organizer with lubrication
and a small lamp illuminating red.

97.     The maintenance staff and I went back to the leasing office to see the on-site
manager.   While speaking with the on-site manager, she received a phone call from (503) 875-
9755.   The on-site manager stated this phone number was the lady who leased the apartment,
who is ChaoDan Wang.   ChaoDan Wang told the on-site manager she would have a "moving"

**Page 49 – Affidavit of June Piniewski**                    **USAO Version Rev. April 2017**

and "cleaning" crew come in over the weekend and she would be at the leasing office at 10 a.m. on Monday morning.

98.     Based on my training and experience, and encounters with other known brothels ran by this organization I recognized this location to be a working brothel because of the following: an Asian female in a robe answered the door, the Asian female stated she spoke very little English and attempted to call someone several times before letting us into the apartment, there was minimal furniture within the apartment, only one bed in a two bedroom apartment with the other bedroom being completely empty, the bed was on a box spring on the floor with a towel laid on top of the sheet, there was a "red light" within the lamp in the bedroom, next to the bed on top of a plastic drawer container were tissues, lubrication and lotion.

99.     Between September 14th and 17th, 2018, video surveillance of 8364 Pfaffle Street, Apartment 109, Portland, Oregon, showed that each day approximately seven to ten different men would arrive at the door, knock and enter.   The length of stay varied from 15 minutes to an hour.

100.     On September 30, 2018 I noted on video surveillance several Asian males and females moving furniture out of 8364 SW Pfaffle St, Apartment 109, Portland, OR 97223.   I responded to the location and conducted physical surveillance.   There were two vehicles parked in front of apartment 109:

- white 2017 Lexus bearing Georgia tag CHP2297

- white 2014 Chevy Silverado bearing Oregon tag 345GSK

The furniture from the apartment was placed into the bed of the Chevy Silverado.   Both vehicles exited the apartment complex.   The Lexus traveled east on SW Pfaffle Street and the Chevy

**Page 50 – Affidavit of June Piniewski**                    **USAO Version Rev. April 2017**

Silverado traveled west on SW Pfaffle Street.   I followed the Chevy Silverado west on SW Pfaffle St and then north on SW Hall Boulevard.   The Chevy Silverado made no stops in between and ended at 13957 SW Ronald Court, Beaverton, OR 97006.   I observed the white Lexus above also at the address.   The furniture from the truck was downloaded and brought into the garage of the Ronald Court address.

101.   On October 19, 2018, physical surveillance observed two Asian people exit the residence of 13957 SW Ronald Court, Beaverton, OR, and enter a white Lexus bearing Georgia tag CHP2297 which was parked in the driveway.   The vehicle was observed by Beaverton Police Department and a traffic stop was conducted.   The two occupants within the vehicle were identified as: Yang Fan and Ting Fu.   Both of the occupant's identification were associated with an address of: 8412 NW 8th Street, Miami, FL 33126.   A search of law enforcement databases revealed the vehicle was registered to Dong Pan and Chuanyu Hotpot LLC.

102.   Since October 2018, both physical and video surveillance has observed Ting Fu, at the residence of 13957 SW Ronald Court, Beaverton, OR, on almost a daily basis.   Agents have seen her both enter and exit the residence throughout the day.   Agents have also repeatedly seen the white 2017 Lexus bearing Georgia tag CHP2297 at this residence.   Based upon our repeated observations of the residence I believe that Ting Fu is a resident at the 13957 SW Ronald Court, Beaverton, Oregon.   As noted above, Ting Fu is suspected of being a local boss in Portland, OR for the Chen STO.   We have also found records in which she is identified as sending money to Mark Chen and it appears that she helps manage and run local providers.   I believe she will have records and items related to her criminal activities within the residence.

103.    On October 22, 2018, law enforcement targeted on-line advertisements that we know, from our experience, are often used to advertise acts of prostitution, specifically from the website, "supermatchescort.com."   Under the section, "Girls in your city" and "Portland, OR." two advertisements listing the same phone number read:

> *Asian Jenny*
> *Tigard: Asian Jenny*
> *503-765-9147*
> *Slim young Asian*
> *Portland Escort*
> *Young Asian*
> *5037659147*
> *www.portlandasianescort.com*
>
> *Asian Sophia*
> *Beaverton/Tigard/Airport*
> *503-765-9147 or 636-287-2242*
> *In call/outcall 24/7*
> *Portland Asian Escort*
> *Portland Escort*
> *Beaverton/Tigard/Airport*

104.    Law enforcement sent a series of text messages to phone number (503)765-9147, in an undercover capacity, in attempt to set up a "date."   Within the text thread, two different addresses were given:

> "hi hun I am at 590 NW Lost Springs Terrace, Portland, OR 97229...140hh 180h.. NO Black gentlemen Plz what time is good for you honey?"
>
> "hi hun I am at 13009 SW 68th Pkwy, Tigard, OR 97223...140hh 180h..NO Black gentlemen Plz what time is good for you honey?"

105.    On October 28, 2018, I made contact with the General Manager for the Extended Stay, 13009 SW 68th Parkway, Tigard, OR.   The General Manager advised that room 317 had an occupant named ChaoDan Wang check in on October 4, 2018.

106.    The General Manager advised Wang checked in with a Chinese passport and credit card.    She extended her stay on October 10, 2018.    The General Manager advised after watching the video surveillance it appears a different Asian female extends their stay on October 18th, 25th and 28th and paid with cash each time.    I recognized that both Asian females in the video surveillance appeared to match the description of the two Asian females associated with video surveillance from 8364 SW Pfaffle Street, Apartment 109, Portland, Oregon.

### Locations 2 and 3

### (2) - 1030 SW Jefferson Avenue, Portland, OR and

### (3) – 410 NW Lost Springs Terrace, Apartment 108, Portland, OR

107.    On January 5, 2018, the Portland Police Bureau (PPB) Sex Trafficking Unit and I conducted an operation related to investigating prostitution activity that was occurring in the greater Portland, Oregon metropolitan area.    As part of this investigation we were targeting on-line advertisements that we know, from our experience, are often used to advertise acts of prostitution.    Officer Gallagher found an ad on the website "Backpage.com" under the section, "women seeking men."    The ad was titled "646-670-3097."    The Backpage post ID # 23065852 was attached to the ad.    The ad had several photos and a video of Asian women posing provocatively or in lingerie.

108.    Officer Gallagher sent a text message to the number listed in the ad asking if he would be able to come see her (the escort posted in the ad).    Through back and forth text message conversations, an agreement was made to meet around 4:15-4:30 p.m. for an hour and a payment for $140.00.    The address of 1030 SW Jefferson Street was then sent by the person to Officer Gallagher.    Once Officer Gallagher arrived at the apartments located at 1030 SW

Jefferson Street, in Portland, Oregon, Officer Gallagher followed another tenant into the building since the building has a secured front door.   He then waited for the next text message which told him to go to apartment number 340.   Officer Gallagher knocked on the door of the apartment and an Asian female (later identified as Rong Zhang) answered the door wearing a sheer, very short teddy and heels holding a cell phone in her hand.   Officer Gallagher noticed once inside she was texting on a black color phone.   Officer Gallagher then announced that he was a police officer with the Portland Police Bureau.   The phone she was holding was placed on the kitchen counter by Officer Gallagher.

109.    When the Portland Police Bureau Sex Trafficking Unit and I entered the apartment we observed the following inside the studio apartment: a minimal amount of food; a minimal amount of furniture; a suitcase filled with lingerie; CostCo items in bulk; loads of white towels; money wire transfer receipts; a bed with a towel laid down on it; and, garbage bag full of unused condoms.

110.    Zhang was read her *Miranda* rights and stated she understood but refused to sign anything.   She gave verbal consent to search the apartment.   Zhang was shown the four phones and tablet that were found inside the apartment and asked if they belonged to her, she nodded yes.   When asked, Zhang showed the investigators the password to her locked devices.   Zhang refused to speak any further with investigators and refused to sign the consent to search form for investigators.   PPB seized the devices and left Zhang a property receipt.   Custody of the Devices was then transferred to the FBI for further extraction and analyzing.

111.    On December 21, 2018, Task Force Officer (TFO) Chad Opitz and SA Piniewski conducted an operation related to the investigation of prostitution activity occurring on the

website "supermatchescort.com" in Portland, Oregon.    TFO Opitz found an ad on the website

"supermatchescort.com" under the section, "Girls in your city" and "Portland, OR."    The phone

number "647-687-7096" was listed on the main/home page of the website and under the section

for, "Portland, OR" two advertisements listing the same phone number read:

> *Asian Jenny*
> *Tigard: Asian Jenny*
> *503-765-9147 or 636-287-2242*
> *Slim young Asian*
> <u>*Portland Escort*</u>
> *Young Asian*
> *5037659147 or 6362872242*
> *www.portlandasianescort.com*
>
> *Asian Sophia*
> *Beaverton/Tigard/Airport*
> *503-765-9147 or 636-287-2242*
> *In call/outcall 24/7*
> <u>*Portland Asian Escort*</u>
> *Portland Escort*
> *Beaverton/Tigard/Airport*

Both advertisements had several photos of Asian women posing provocatively in lingerie.

These appeared to be the same postings observed on October 22, 2018 referenced above.    TFO

Opitz sent a text message to 647-687-7096 and 503-765-9147 asking if she was available.    The

"647-687-7096" number responded and the following conversation took place:

> *TFO Opitz: Hi. Looking to see someone in Beaverton around 1130? You*
> *      have a spot?*
> *TFO Opitz: Would love a hr date*
> **647-687-7096: Ok**
> **647-687-7096: 140hh 180h**
> **647-687-7096: 410 nw lost springs terrace, portland**
> *TFO Opitz: Ok. Hour is perfect. 180 is fair*
> *TFO Opitz: 1130 is good then? Is there a unit number or is that the address?*
> *TFO Opitz: So 11:30?*
> **647-687-7096: Ok**
> *TFO Opitz: Good thx!*

**Page 55 – Affidavit of June Piniewski**                    **USAO Version Rev. April 2017**

> *TFO Opitz: What unit number would I go to?*
> **647-687-7096: Arrive?**
> *TFO Opitz: Oh no sorry. Was just asking for when I got there. Sorry*
> *TFO Opitz: Unless I can know now....*
> **647-687-7096:Txt or call me when u arrive hun**

Once TFO Opitz arrived at the apartments he texted that he had arrived and the number

responded, room "108."   The text then continued as such:

> **647-687-7096: Ok**
> **647-687-7096: Room 108**
> **647-687-7096: Are you Asian or white or Latinos or**
> *TFO Opitz: White guy*
> **647-687-7096: Wait 5min**
> *TFO Opitz: Ok*
> **647-687-7096: Room 108 Come in**

112.    While waiting we observed a white male leave the apartment and law

enforcement later made contact with him.    TFO Opitz went ahead and knocked on the door of

the apartment and an Asian female, later identified as Sally Hy Leung, answered the door

wearing red lingerie.    TFO Opitz identified himself as law enforcement as he entered the

apartment.    Leung gave verbal consent to search the apartment and her cellular phone.    Leung

had the following approximate amounts of money throughout the apartment (none of the money

was seized):

- $100 in her wallet
- $300 in a white envelope in her suitcase
- $280 in a white envelope that was dated "12/18/18"
- $700 in a bank bag
- $400 in a red wooden box in the closet
- Leung also had $11,000 in her vehicle glove box (Leung stated this was all of her "savings")

113.    Leung agreed to answer questions and the following is a summary of her

interview:

**Page 56 – Affidavit of June Piniewski**                    **USAO Version Rev. April 2017**

After being asked, Leung identified her boss as having a last name "Sun."    She
stated she used to sell life insurance and that is how she met Sun. Leung lost her
job recently and Sun told her to come to Oregon and work for her. Leung stated
she drove from California to Oregon around the end of November 2018.    Leung
admitted that she performs sex acts for money. Leung stated Sun comes every two
days, usually at night time to pick up the money. Leung must write everything
down and keep records of how much she owes Sun. She must hand the money to
Sun in person so they can count it together. Leung stated she is paid in cash by
Sun.    She does not know what Sun does with the cash after she takes it.    Leung
believed Sun drove an old Dodge van but is unsure what color and that Sun owns
a massage parlor here in Oregon. During the interview with Leung, her phone was
continually ringing and receiving messages through WeChat.

114.    A search of law enforcement databases identified Te Jung Sun as the subscriber to

phone number of "510-552-5292."    FBI records indicated that 510-552-5292 had contact with

"503-875-9755" (Chaodan Wang's phone number) on November 8, 2018.

115.    The following was observed within the apartment: minimal furniture; Kirkland

Brand products; money; one bedroom with a red lamp; mattress on the floor with a sheet and

towel on top; nightstand next to the bed with tissues/towels/wet towels/lotions; and, records

regarding customers and the amount of money owed.

116.    Leung showed investigators her WeChat groups.    I observed three WeChat

groups labeled: "385 building410 beaverton", "108", and "Beaverton 108." Leung stated the

main WeChat group that the "boss" is in and tells her when customers are coming is "Beaverton

108."    Leung opened the WeChat conversation and I observed Zongtao Chen's WeChat profile

picture.[4]    Chen's WeChat contact card contained the same name at the top when translated,

"Drift" and WeChat #: "wxid_votji7m9h0." (see Image JJ) A picture of some of the conversation

---

[4]      On or about June 27, 2018, CHS informed me that Zongtao Chen, a.k.a. Mark Chen, had
changed his WeChat profile picture and then she showed me the new WeChat profile, which also
has his name listed and two phone numbers associated with him.

**Page 57 – Affidavit of June Piniewski**                    **USAO Version Rev. April 2017**

was taken and then translated by FBI Linguist (see Image KK).



Chen's WeChat

Image JJ



Image KK

Leung's WeChat



Chen's WeChat

Image KK continued



117.    While speaking with Leung, an unknown male attempted to enter the apartment.

The male stated he was there to "see a friend." After being questioned, he showed text messages

from "CoCo", phone number "803-716-9992" which related the following:

> *Male @ 12:14 p.m.*: going to need a unit number
> *CoCo @ 12:16 p.m.*: we open at 10am 1030 SW jefferson st Portland OR 97201
>    hr 180 hh 140 GFE300 NO AA
> *Male @ 12:18 p.m.*: I'm the one waiting at Lost Spring Terrace. Are you ready for
>    me?
> *CoCo @ 12:23 p.m.*: The girl said the police were coming. You can come next
>    ime
> *CoCo @ 12:24 p.m.*: go to jefferson?
> *CoCo @ 12:25 p.m.*: a picture of an Asian female was sent

**Page 59 – Affidavit of June Piniewski**          **USAO Version Rev. April 2017**

118.    Leung agreed to contact me when Sun text her to pick up the money. At

approximately 5:02 p.m., Leung told me that Sun had arrived.    Physical surveillance observed a

grey van bearing Oregon tag 928EEJ arrive at approximately 4:52 p.m.    An Asian female exited

the vehicle and entered apartment 108.

119.    A search of law enforcement databases concluded the following: the 2005 Dodge

Caravan Oregon tag 928EEJ was registered to Larry Lee Hancock.

120.    At approximately 7:29 p.m., Leung advised that in the WeChat group Sun told

"dispatch" to not take any calls for the rest of the day and they will start again tomorrow with old

customers and to not take any calls from non-recognized numbers.    Leung left and Sun stayed

in the apartment. Physical surveillance was discontinued at approximately 8:00 p.m.

121.    On January 11, 2019, I went and spoke with the apartment manager for 1030 SW

Jefferson Avenue, Portland, OR.    She confirmed that the current lessee at the residence is the

same one who has leased the residence since 2017.

**Location 4**

**13309 SW 72nd Avenue, Apartment 1D, Tigard, OR**

122.    On January 2, 2019, Portland Police Bureau Officer (PPB) Mike Gallagher

targeted on-line advertisements from the website, "supermatchescort.com" that we know, from

our experience, is used to advertise acts of prostitution.    The phone number "647-687-7096,"

which we have previously seen, was listed on the main/home page of the website.    Through

back and forth text messages the following conversation occurred:

> *Officer Gallagher: I'm just getting off work. You available?*
> **647-687-7096: Which city**
> *Officer Gallagher: I'm in Tigard*
> **647-687-7096: 13301 sw 72nd ave, Tigard, or 97223..What time is good for u**

**hun?**
*Officer Gallagher: Does 630 work???? What r the donations*
**647-687-7096: Ok**
**647-687-7096: 140hh 180h**
*Officer Gallagher: That works. I'd like an hr*
**647-687-7096: Ok**
*Officer Gallagher: I'll shud be there in 5 mins*
*Officer Gallagher: Just parked*
*Officer Gallagher: ????*
**647-687-7096: Ok**
**647-687-7096: Hi**
**647-687-7096: Building 13309**
**647-687-7096: Room 1d**
*Officer Gallagher: Is this a sting. Just saw cop car drive by??? Sketched out right*
                    *now*
**647-687-7096: Google my phone number**

123.    Based upon the messages above, it appears to me that the Chen STO set up a new

brothel location at 13309 SW 72nd Avenue, Apartment 1-D, Tigard, Oregon 97223.   In an effort

to verify this, on January 9, 2019, between the hours of 9:45am and 12:45pm, Task Force Officer

(TFO) Yonsoo Lee, Portland Division, and Detective Julie Hicks, Tigard Police Department

conducted physical surveillance at 13309 SW 72nd Avenue, Apartment 1-D, Tigard, Oregon

97223.   During the surveillance, agents made the following observations, which all indicate,

based upon my training and experience and observations of similar locations we have

investigated that this location is also an active brothel:

> **11:20 a.m.** – Detective Hicks observed a white male adult (1) approximately 50
> years of age, arrive in a gray Toyota Corolla bearing Oregon license plate
> 885CBP exits the vehicle and enters apartment 1-D.

> **11:55 a.m.** – Detective Hicks observes the same white male (1) exit apartment 1-
> D and leaves in the gray Toyota Corolla.

> **12:04 p.m.** – TFO Lee observed a different white male adult (2) approximately
> 40-50 years of age, arrive in a silver Mercedes S50 bearing Oregon license
> plate CU39153. The white male (2) pulls into the apartment parking lot,
> into a parking space directly in front of apartment 1-D. The vehicle then

**Page 61 – Affidavit of June Piniewski**                    **USAO Version Rev. April 2017**

immediately pulls back out and leaves the apartment complex.

**12:11 p.m.** – TFO Lee observed the same silver Mercedes re-enter the parking lot.   The white male driver (2) parks in the driveway to the apartment complex around the corner and enters apartment 1-D.

**12:24 p.m.** – TFO Lee observed the same white male (2) exit apartment 1-D and get into the same Mercedes and exits the complex at 12:26 p.m.

**12:31 p.m.** – TFO Lee observed an Asian female adult (1) approximately 30 years of age, exit apartment 1-D wearing a bath robe and carrying what appeared to be a white kitchen sized trash bag. The Asian female (1) walked across the parking lot to the garbage dumpsters and entered the covered dumpster area. She was not observed by TFO Lee due to the covering.   The Asian female (1) then exits the dumpster area without the trash bag and re-enters apartment 1-D.

**12:34 p.m.** – TFO lee observed a gray Toyota TC bearing Oregon license plate 405JJB enter the apartment parking lot and stops near the community mailboxes.   The driver of the vehicle is unidentified and never gets out of vehicle.   An unknown race female adult (2) approximately 50-60 years of age, exits the front passenger seat.   The female then stands next to the mailboxes for a few moments, walks across the driveway and enters the covered dumpster area.   A few moments later the female (2) exits the covered dumpster area carrying a kitchen sized trash bag.   The trash bag appears to be the same trash bag as the Asian female (1) was carrying. The female (2) appears to look inside the trash bag and places it into the trunk of the Toyota TC, prior to getting back into the passenger side.   The Toyota exits the apartment parking lot at approximately 12:35 p.m.

124.    Based upon my training and experience, the text messages conversations above as well as the observations of men coming to the location, staying a relatively short time, and then leaving is indicative that the location is an active brothel.

///

///

///

**Page 62 – Affidavit of June Piniewski**                    **USAO Version Rev. April 2017**

### Knowledge of STOs and Request for Items to Seize[5]

125.     As described above and in Attachment B, this application seeks permission to

search for various physical items, including records (in whatever form they are found) that may

be found on the Premises identified above that I know are evidence, instrumentalities, and fruits,

of violations of Title 18, United States Code, Sections 2, 371, 1952, and 2421, involving

individuals engaged in criminal conspiracy to knowingly transport individuals in interstate and

foreign commerce with intent that such individuals engage in prostitution and who are using a

facility in interstate commerce with the intent to promote, manage, establish, carry on and

facilitate the promotion, management, establishment, and carrying on of unlawful prostitution

activities.

126.     One form in which the records will likely be found is data stored on a computer's

hard drive, on other storage media, or other digital devices, including cell phones (hereinafter

---

[5]     Based on my training and experience, I use the following technical terms to convey the
following meanings:

a.     *IP address*.   The Internet Protocol address (or simply "IP address") is a unique
numeric address used by digital devices on the Internet.   Every digital device attached to the
Internet must be assigned an IP address so that Internet traffic sent from and directed to that
digital device may be directed properly from its source to its destination.   Most Internet service
providers control a range of IP addresses.   Some digital devices have static—that is, long-
term—IP addresses, while other digital devices have dynamic—that is, frequently changed—IP
addresses.

b.     *Internet*.   The Internet is a global network of digital devices that communicate
with each other.   Due to the structure of the Internet, connections between devices on the
Internet often cross state and international borders, even when the devices communicating with
each other are in the same state.

c.     *Storage medium*.   A storage medium is any physical object upon which data can
be recorded.   Examples include hard disks, RAM, floppy disks, flash memory, CD-ROMs, and
other magnetic or optical media.

**Page 63 – Affidavit of June Piniewski**                    **USAO Version Rev. April 2017**

collectively referred to as digital devices).    Thus, the warrant applied for would authorize the

seizure of electronic storage media or the copying of electronically stored information, all under

Rule 41(e)(2)(B).

     127.    Through my training and experience and involvement in this investigation, I have

learned that prostitution is primarily, and its base level involving a date between a provider and a

customer, a cash based business.    When money is collected by a provider it then starts to get

transferred to other people, including to a boss, as well as others within the organization, in a

variety of forms.    Once the money is received, it is also often converted or used to buy both

physical items of value as well as property.    Finding currency and currency equivalents

representing the proceeds of illegal activities, money wrappers, and other documents and items

evidencing the obtaining, expenditure, transfer, and/or concealment of assets are evidence of the

underlying criminal activity.    Documents relating to real estate transactions including but not

limited to: loan and mortgage records, correspondence with financial institutions, customer or

nominee information, documents relating to closings and real estate transactions, documents

reflecting monies paid or received, lease agreements, customer account information, income and

expenses summaries, cash disbursement journals, financial statements, state and federal income

tax returns help provide evidence of the underlying criminal activity.    Bank records including

but not limited to: receipts, bank and savings and loan records of deposit, statements, and other

bank records, letters of credit, money orders, cashier's checks, passbooks, canceled checks,

certificates of deposit, and other documents reflecting financial transactions help provide

evidence of the underlying criminal activity.    Other financial records including but not limited

to: cash disbursement journals, financial statements, states of account, deposit slips, money

**Page 64 – Affidavit of June Piniewski**            **USAO Version Rev. April 2017**

orders, cashier's checks, and related receipts, canceled checks, check registers, passbooks, credit

card records and receipts, any records related to digital money transfers, letters of credit, ledgers,

tax returns, and any other records pertaining to the receipt, expenditure, or concealment of

income also help provide evidence of the underlying criminal activity.   I also know that

individuals will often hide these items, including within safes.

128.   Through my training and experience and involvement in this investigation, I have

learned that providers and the STOs involved in prostitution regularly keep records, both in

terms of scheduling "dates," but also documenting information about their customers,

information about the providers, contact lists, items purchased, others involved in the

organization, and the money made, owed, and transferred.

129.   Through my training and experience and involvement in this investigation, I have

learned that the providers involved in prostitution regularly use and supply condoms, lotions, and

other sexual paraphernalia to service clients.

130.   Through my training and experience and involvement in this investigation, I have

learned that many of the providers involved in the STO under investigation are from Asian

countries.   I have also learned that in these types of investigations that the providers, and other

people involved in the criminal activity, do not always provide their true names and thus U.S. or

foreign identification documents, U.S. or foreign passports, birth certificates and records,

driver's licenses, identification cards, employment identification, immigration documents,

naturalization certificates, etc. which may be used to establish identity, citizenship, eligibility,

residence, or domicile are important items of evidence to prove the identity of the involved

individuals.

131.     Through my training and experience and involvement in this investigation, I have learned that the STO is regularly moving and helping to facilitate the transportation of various providers both internationally and throughout the United States.   I thus seek permission to search and seize any travel records including but not limited to payment or confirmation for: airline tickets, bus/train tickets, hotel/motel receipts, Uber, Lyft, taxi, and airport purchases that is evidence of this activity which has been done to advance the criminal activity under investigation.

132.     Through my training and experience and involvement in this investigation, I have learned that individuals involved in the STO under investigation extensively use cellular phones to communicate through voice, text, and photo messages, which are often coded to conceal their true meaning from others, to carry out and facilitate their illegal activities.

133.     Through my training and experience and involvement in this investigation, I have learned that the STO maintains electronic records of prostitution activity and/or advertising via computer or handheld electronic device and/or electronic data storage medium and thus seek to search for and seize any electronic devices, phones, computers, and tablets.

134.     There is probable cause to believe, and I do believe, that records will be stored on a digital device because, based on my knowledge, training, and experience, I know that the STO under investigation heavily uses computers, cellular telephones, and other electronic devices to schedule prostitution "dates," to communicate with customers, and to communicate with others in the organization.

        a.     Computer files or remnants of such files can be recovered months or even years after they have been downloaded onto a digital device, deleted, or viewed via the Internet.

Electronic files downloaded to a digital device can be stored for years at little or no cost. Even when files have been deleted, they can be recovered months or years later using forensic tools. When a person "deletes" a file on a digital device, the data contained in the file does not actually disappear; rather, that data remains on the digital device until it is overwritten by new data. Therefore, deleted files or remnants of deleted files, may reside in free space or slack space—that is, in space on the digital device that is not currently being used by an active file—for long periods of time before they are overwritten. In addition, a digital device's operating system may also keep a record of deleted data in a "swap" or "recovery" file.

        b.     Wholly apart from user-generated files, digital devices—in particular, internal hard drives—contain electronic evidence of how a digital device has been used, what it has been used for, and who has used it. To give a few examples, this forensic evidence can take the form of operating system configurations, artifacts from operating system or application operation, file system data structures, and virtual memory "swap" or paging files. Digital device users typically do not erase or delete this evidence, because special software is typically required for that task. However, it is technically possible to delete this information.

        c.     Similarly, files that have been viewed via the Internet are sometimes automatically downloaded into a temporary Internet directory or "cache."

        d.     Based on actual inspection of other evidence related to this investigation, including email search warrants, I am aware that digital devices were used to generate, store, and print documents used to promote the illegal prostitution activities that we are investigation. Thus, there is reason to believe that there is a digital device currently located on the Premises

**Page 67 – Affidavit of June Piniewski**                    **USAO Version Rev. April 2017**

listed above that we seek to search.   From my experience, every provider that we have

encountered has at least had a cellular telephone.

135.    As further described in Attachment B, this application seeks permission to locate

not only computer files that might serve as direct evidence of the crimes described on the warrant

but also for forensic electronic evidence that establishes how digital devices were used, the

purpose of their use, who used them, and when.   There is probable cause to believe that this

forensic electronic evidence will be on any digital device in the Premises, because, based on my

knowledge, training, and experience, I know:

a.      Data on the digital device can provide evidence of a file that was once on

the digital device but has since been deleted or edited, or of a deleted portion of a file (such as a

paragraph that has been deleted from a word processing file).   Virtual memory paging systems

can leave traces of information on the storage medium that show what tasks and processes were

recently active.   Web browsers, email programs, and chat programs store configuration

information on the digital device that can reveal information such as online nicknames and

passwords.   Operating systems can record additional information, such as the attachment of

peripherals, the attachment of USB flash storage devices or other external storage media, and the

times the digital device was in use.   Computer file systems can record information about the

dates files were created and the sequence in which they were created.

b.      Forensic evidence on a digital device can also indicate who has used or

controlled it.  This "user attribution" evidence is analogous to the search for "indicia of

occupancy" while executing a search warrant at a residence.   For example, registry information,

configuration files, user profiles, email, email address books, "chat," instant messaging logs,

**Page 68 – Affidavit of June Piniewski**                    **USAO Version Rev. April 2017**

photographs, the presence or absence of malware, and correspondence (and the data associated with the foregoing, such as file creation and last-accessed dates) may be evidence of who used or controlled the digital device at a relevant time.   Further, forensic evidence on a digital device can show how and when it was accessed or used.   Such "timeline" information allows the forensic analyst and investigators to understand the chronological context of access to the digital device, its use, and events relating to the offense under investigation.   This "timeline" information may tend to either inculpate or exculpate the user of the digital device.   Last, forensic evidence on a digital device may provide relevant insight into the user's state of mind as it relates to the offense under investigation.   For example, information on a digital device may indicate the user's motive and intent to commit a crime (e.g., relevant web searches occurring before a crime indicating a plan to commit the same), consciousness of guilt (e.g., running a "wiping program" to destroy evidence on the digital device or password protecting or encrypting such evidence in an effort to conceal it from law enforcement), or knowledge that certain information is stored on a digital device (e.g., logs indicating that the incriminating information was accessed with a particular program).

       c.     A person with appropriate familiarity with how a digital device works can, after examining this forensic evidence in its proper context, draw conclusions about how digital devices were used, the purpose of their use, who used them, and when.

       d.     The process of identifying the exact files, blocks, registry entries, logs, or other forms of forensic evidence on a digital device that are necessary to draw an accurate conclusion is a dynamic process.   While it is possible to specify in advance the records to be sought, electronic evidence is not always data that can be merely reviewed by a review team and

**Page 69 – Affidavit of June Piniewski**           **USAO Version Rev. April 2017**

passed along to investigators.   Whether data stored on a digital device is evidence may depend on other information stored on the digital device and the application of knowledge about how a digital device behaves.   Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

e.      Further, in finding evidence of how a digital device was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a digital device.   For example, the presence or absence of counter-forensic programs or anti-virus programs (and associated data) may be relevant to establishing the user's intent.

f.      I know that when an individual uses a digital device to commit the crimes under investigation the individual's digital device will generally serve both as an instrumentality for committing the crime and also as a storage medium for evidence of the crime.   The digital device is an instrumentality of the crime because it is used as a means of committing the criminal offense.   The digital device is also likely to be a storage medium for evidence of crime.   From my training and experience, I believe that a digital device used to commit a crime of this type may contain: data that is evidence of how the digital device was used; data that was sent or received; notes as to how the criminal conduct was achieved; records of Internet discussions about the crime; and other records that indicate the nature of the offense.

136.    In most cases, a thorough search of the Premises for information that might be stored on a digital device often requires the seizure of the device and a later, off-site review consistent with the warrant.   In lieu of removing a digital device from the Premises, it is sometimes possible to image or copy it.   Generally speaking, imaging is the taking of a

**Page 70 – Affidavit of June Piniewski**          **USAO Version Rev. April 2017**

complete electronic picture of the digital device's data, including all hidden sectors and deleted files. Either seizure or imaging is often necessary to ensure the accuracy and completeness of data recorded on the digital device and to prevent the loss of the data either from accidental or intentional destruction. This is true because:

       a.     As noted above, not all evidence takes the form of documents and files that can be easily viewed on site. Analyzing evidence of how a digital device has been used, what it has been used for, and who has used it requires considerable time, and taking that much time on premises could be unreasonable. As explained above, because the warrant calls for forensic electronic evidence, it is exceedingly likely that it will be necessary to thoroughly examine digital devices to obtain evidence. Digital devices can store a large volume of information. Reviewing that information for things described in the warrant can take weeks or months, depending on the volume of data stored, and would be impractical and invasive to attempt on-site.

       b.     Records sought under this warrant could be stored in a variety of formats that may require off-site reviewing with specialized forensic tools. Similarly, digital devices can be configured in several different ways, featuring a variety of different operating systems, application software, and configurations. Therefore, searching them sometimes requires tools or knowledge that might not be present on the search site. The vast array of hardware and software available makes it difficult to know before a search what tools or knowledge will be required to analyze the system and its data on the Premises. However, taking the digital device off-site and reviewing it in a controlled environment will allow its examination with the proper tools and knowledge.

**Page 71 – Affidavit of June Piniewski**                          **USAO Version Rev. April 2017**

137.     Based upon my training and experience, it is likely that the Premises will contain at least one Apple brand device, such as an iPhone or iPad, because we have encountered iPhones during this investigation.

a.     I know from my training and experience, as well as from information found in publicly available materials including those published by Apple, that some models of Apple devices such as iPhones and iPads offer their users the ability to unlock the device via the use of a fingerprint or thumbprint (collectively, "fingerprint") in lieu of a numeric or alphanumeric passcode or password.   This feature is called Touch ID.

b.     If a user enables Touch ID on a given Apple device, he or she can register up to 5 fingerprints that can be used to unlock that device.   The user can then use any of the registered fingerprints to unlock the device by pressing the relevant finger(s) to the device's Touch ID sensor, which is found in the round button (often referred to as the "home" button) found at the bottom center of the front of the device.   In my training and experience, users of Apple devices that offer Touch ID often enable it because it is considered to be a more convenient way to unlock the device than by entering a numeric or alphanumeric passcode or password, as well as a more secure way to protect the device's contents.   This is particularly true when the user(s) of the device are engaged in criminal activities and thus have a heightened concern about securing the contents of the device.

c.     In some circumstances, a fingerprint cannot be used to unlock a device that has Touch ID enabled, and a passcode or password must be used instead.   These circumstances include: (1) when more than 48 hours has passed since the last time the device was unlocked and (2) when the device has not been unlocked via Touch ID in 8 hours and the

passcode or password has not been entered in the last 6 days.   Thus, in the event law

enforcement encounters a locked Apple device, the opportunity to unlock the device via Touch

ID exists only for a short time.   Touch ID also will not work to unlock the device if (1) the

device has been turned off or restarted; (2) the device has received a remote lock command; and

(3) five unsuccessful attempts to unlock the device via Touch ID are made.

    d.  The passcode or password that would unlock the Apple device found

during the search of the Premises is not known to law enforcement.   Thus, it will likely be

necessary to press the fingers of the users of the Apple device found during the search of the

Premises to the device's Touch ID sensor in an attempt to unlock the device for the purpose of

executing the search authorized by this warrant.   Attempting to unlock the relevant Apple

device(s) via Touch ID with the use of the fingerprints of the users is necessary because the

government may not otherwise be able to access the data contained on those devices for the

purpose of executing the search authorized by this warrant.

    e.  In my training and experience, the person who is in possession of a device

or has the device among his or her belongings at the time the device is found is likely a user of

the device.   However, in my training and experience, that person may not be the only user of the

device whose fingerprints are among those that will unlock the device via Touch ID, and it is

also possible that the person in whose possession the device is found is not actually a user of that

device at all.   Furthermore, in my training and experience, I know that in some cases it may not

be possible to know with certainty who is the user of a given device, such as if the device is

found in a common area of a premises without any identifying information on the exterior of the

device.   Thus, it will likely be necessary for law enforcement to have the ability to require any

**Page 73 – Affidavit of June Piniewski**       **USAO Version Rev. April 2017**

occupant of the Premises to press their fingers against the Touch ID sensor of the locked Apple device found during the search of the Premises in order to attempt to identify the device's user(s) and unlock the device(s) via Touch ID.

      f.      Although I do not know which of a given user's 10 fingerprints is capable of unlocking a particular device, based on my training and experience I know that it is common for a user to unlock a Touch ID-enabled Apple device via the fingerprints on thumbs or index fingers.   In the event that law enforcement is unable to unlock the device(s) found in the Premises as described above within the five attempts permitted by Touch ID, this will simply result in the device requiring the entry of a password or passcode before it can be unlocked.

      g.      I therefore request that the Court authorize law enforcement to press the fingers, including thumbs, of the above-named individuals found at the Premises to the Touch ID sensor of the device(s), such as an iPhone or an iPad, found at the Premises for the purpose of attempting to unlock the device(s) via Touch ID in order to search the contents as authorized by this warrant.)

138.   *Nature of the examination*.   Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant for which I apply would permit seizing, imaging, or otherwise copying digital devices that reasonably appear to contain some or all of the evidence described in the warrant and would authorize a later review of the device or information consistent with the warrant.   The later review may require techniques, including but not limited to computer-assisted scans of the entire device, that might expose many parts of a hard drive to human inspection in order to determine whether it is evidence described by the warrant.

139.    The initial examination of the digital device will be performed within a reasonable amount of time not to exceed 120 days from the date of execution of the warrant.   If the government needs additional time to conduct this review, it may seek an extension of the time period from the Court within the original 120-day period from the date of execution of the warrant.   The government shall complete this review within 180 days of the date of execution of the warrant.   If the government needs additional time to complete this review, it may seek an extension of the time period from the Court.

140.    If, at the conclusion of the examination, law enforcement personnel determine that particular files or file folders on the digital device do not contain any data falling within the scope of the warrant, they will not search or examine those files or folders further without authorization from the Court.   Law enforcement personnel may continue to examine files or data falling within the purview of the warrant, as well as data within the operating system, file system, software application, etc., relating to files or data that fall within the scope of the warrant, through the conclusion of the case.

141.    If an examination is conducted, and the digital device does not contain any data falling within the ambit of the warrant, the government will return the digital device to its owner within a reasonable period of time following the search and will seal any image of the digital device, absent further authorization from the Court.

142.    The government may retain the digital device as evidence, fruits, contraband, or an instrumentality of a crime or to commence forfeiture proceedings against the digital device and/or the data contained therein.

143.    The government will retain a forensic image of the digital device for a number of reasons, including proving the authenticity of evidence to be used at trial, responding to questions regarding the corruption of data, establishing the chain of custody of data, refuting claims of fabricating, tampering, or destroying data, and addressing potential exculpatory evidence claims where, for example, a defendant claims that the government avoided its obligations by destroying data or returning it to a third party.

### Conclusion

144.    Based on the foregoing, I have probable cause to believe, Zong Tao Chen, a.k.a. Zongtao Chen, a.k.a. Mark Chen; Weixuan Zhou, Yan Wang, a.k.a. Sarah; Ting Fu; Chaodan Wang and other known and unknown individuals are engaged in a criminal conspiracy that is using facilities in interstate or foreign commerce, specifically computers and cellular telephones, with the intent to promote, manage, establish, and carry on acts to facilitate the promotion, management, establishment, and carrying on of an unlawful activity namely, a business enterprise involving prostitution offenses in violation of the laws of the State in which they are committed, to-wit prostitution in violation of Oregon Revised Statute (ORS) 167.007 and of the United States, and has thereafter performed and attempted to perform an act to promote, manage, establish, and carry on and to facilitate the promotion, management, establishment, and carrying on of such unlawful activity and is also knowingly transporting individuals in interstate and foreign commerce with intent that such individuals engage in prostitution and I do believe, that the premises described in Attachment A contains the items set forth in Attachment B, which I know based upon my training and experience are evidence, contraband, and instrumentalities of violations of 18 U.S.C. §§ 2, 371, 1952, and 2421.   I therefore request that the Court issue a

**Page 76 – Affidavit of June Piniewski**                    **USAO Version Rev. April 2017**

warrant authorizing a search of the premises described in Attachment A for the items listed in Attachment B and the seizure and examination of any such items found.

145.    This affidavit, the accompanying application, and the requested search warrant were reviewed by Assistant United States Attorney Scott Kerin prior to being submitted to the Court.   AUSA Kerin informed me that in his opinion, the affidavit and application are legally and factually sufficient to establish probable cause to support the issuance of the requested warrant.

June Piniewski
Special Agent, FBI

Subscribed and sworn to before me this ___14th___ day of January 2019.

Honorable John V. Acosta
United States Magistrate Judge

# ATTACHMENT A

## Location 1

13957 SW Ronald Court, Beaverton, OR, 97006, is a two story residence gray in color with white trim.  The numbers "13957" above the garage door.



## ATTACHMENT A

### Location 2

1030 SW Jefferson Avenue, Apartment 340, is a multi floor apartment complex tan in color, with the phrase "Museum Place" above the main entry.  The apartment has the number "340" to the left of the door.



## ATTACHMENT A

### Location 3

410 NW Lost Springs Terrace, Apartment 108, Portland OR 97229, is two bedroom apartment located on the bottom floor on the northwest side of the building. The exterior of the building is tan and brown.



## ATTACHMENT A

### Location 4

13309 SW 72nd Avenue, Apartment 1-D, Tigard, OR 97224, is an apartment located on the west side of the building.  To the left of the front door reads, "1-D."





4

## ATTACHMENT B

### Items to be Seized

1.        Evidence, instrumentalities, and fruits of violations of Title 18, United States Code, Sections 2, 371, 1952, and 2421, involving individuals engaged criminal conspiracy that is using facilities in interstate or foreign commerce, specifically computers and cellular telephones, with the intent to promote, manage, establish, and carry on acts to facilitate the promotion, management, establishment, and carrying on of an unlawful activity namely, a business enterprise involving prostitution offenses in violation of the laws of the State in which they are committed, to-wit prostitution in violation of Oregon Revised Statute (ORS) 167.007 and of the United States, and has thereafter performed and attempted to perform an act to promote, manage, establish, and carry on and to facilitate the promotion, management, establishment, and carrying on of such unlawful activity and is also knowingly transporting individuals in interstate and foreign commerce with intent that such individuals engage in prostitution, from January 2017, until the date that the search warrant is executed, to include the following:

      a.        Currency and currency equivalents representing the proceeds of illegal activities, money wrappers, and other documents and items evidencing the obtaining, expenditure, transfer, and/or concealment of assets;

      b.        Tickets or items used to represent the number of clients served and money owed to a female being prostituted. Any condoms, lotions, or other paraphernalia used to service clients;

      c.        U.S. or foreign identification documents, U.S. or foreign passports, birth certificates and records, driver's licenses, identification cards, employment

identification, immigration documents, naturalization certificates, etc. which may
be used to establish identity, citizenship, eligibility, residence, or domicile;

d.    Documents relating to real estate transactions including but not limited to: loan
and mortgage records, correspondence with financial institutions, customer or
nominee information, documents relating to closings and real estate transactions,
documents reflecting monies paid or received, lease agreements, customer
account information, income and expenses summaries, cash disbursement
journals, financial statements, state and federal income tax returns;

e.    Bank records including but not limited to: receipts, bank and savings and loan
records of deposit, statements, and other bank records, letters of credit, money
orders, cashier's checks, passbooks, canceled checks, certificates of deposit, and
other documents reflecting financial transactions;

f.    Other financial records including but not limited to: cash disbursement journals,
financial statements, states of account, deposit slips, money orders, cashier's
checks, and related receipts, canceled checks, check registers, passbooks, credit
card records and receipts, any records related to digital money transfers, letters of
credit, ledgers, tax returns, and any other records pertaining to the receipt,
expenditure, or concealment of income;

g.    Fruits of crimes and items of value that evidence wealth obtained from the sex
trafficking scheme, including: United States currency, preciousmetals, jewelry,
safe deposit box lease agreements and safe deposit box keys, rare coins, and other

items of value, as well as books and records regarding the acquisition, use, and disposition of such items of value;

h.     Safes and the contents of any safes, locked or unlocked;

i.     Any travel records including but not limited to payment or confirmation for: airline tickets, bus/train tickets, hotel/motel receipts, Uber, Lyft, taxi, and airport purchases.

j.     Latent prints and identifying material from items at the Subject Residence.

k.     Any electronic devices, phones, computers, and tablets.

2.     As used in this attachment, the terms "records" and "information" include all of the foregoing items of evidence in whatever form and by whatever means they may have been created or stored, including any form of computer or electronic storage (such as flash memory or other media that can store data) and any photographic form.  The term "computer" includes all types of electronic, magnetic, optical, electrochemical, or other high speed data processing devices performing logical, arithmetic, or storage functions, including desktop computers, notebook computers, mobile phones, tablets, server computers, and network hardware.  The term "storage medium" includes any physical object upon which computer data can be recorded. Examples include hard disks, RAM, floppy disks, flash memory, CD-ROMs, and other magnetic or optical media.

3.     For any computer or storage medium whose seizure is otherwise authorized by this warrant and any computer, storage medium, or digital device that contains or in which is stored records or information that is otherwise called for by this warrant (hereinafter "Computer"):

**Attachment B**                                                                                    **Page 3**

a.     Evidence of who used, owned, or controlled the Computer at the time the things described in this warrant were created, edited, or deleted, such as logs, registry entries, configuration files, saved usernames and passwords, documents, browsing history, user profiles, email, email contacts, "chat," instant messaging logs, photographs, and correspondence.

b.     Evidence of software that would allow others to control the Computer, such as viruses, Trojan horses, and other forms of malicious software, as well as evidence of the presence or absence of security software designed to detect malicious software.

c.     Evidence of the lack of such malicious software.

d.     Evidence indicating how and when the Computer was accessed or used to determine the chronological context of computer access, use, and events relating to the crime under investigation and to the Computer user.

e.     Evidence indicating the Computer user's state of mind as it relates to the crime under investigation.

f.     Evidence of the attachment to the Computer of other storage devices or similar containers for electronic evidence.

g.     Evidence of counter-forensic programs (and associated data) that are designed to eliminate data from the Computer.

h.     Evidence of the times the Computer was used.

i.     Passwords, encryption keys, and other access devices that may be necessary to access the Computer.

**Attachment B**                                                                              **Page 4**

j.      Documentation and manuals that may be necessary to access the Computer or to conduct a forensic examination of the Computer.

k.      Records of or information about Internet Protocol addresses used by the Computer.

l.      Records of or information about the Computer's Internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses.

m.      Contextual information necessary to understand the evidence described in this attachment.

n.      Routers, modems, and network equipment used to connect computers to the Internet.

4.      During the execution of the search of the Premises described in Attachment A, law enforcement personnel are authorized to press the fingers, including thumbs, of (name the individuals) found at the Premises to the Touch ID sensor of the Apple brand device(s), such as an iPhone or iPad, found at the Premises for the purpose of attempting to unlock the device via Touch ID in order to search the contents as authorized by this warrant.

### Search Procedure

5.      The search for data capable of being read, stored, or interpreted by a computer or storage device, may require authorities to employ techniques, including imaging any computer or storage media and computer-assisted scans and searches of the computers and storage media, that

might expose many parts of the computer to human inspection in order to determine whether it constitutes evidence as described by the warrant.

6.      The initial examination of the computer and storage media will be performed within a reasonable amount of time not to exceed 120 days from the date of execution of the warrant.  If the government needs additional time to conduct this review, it may seek an extension of the time period from the Court within the original 120-day period from the date of execution of the warrant.  The government shall complete this review within 180 days of the date of execution of the warrant.  If the government needs additional time to complete this review, it may seek an extension of the time period from the Court.

7.      If, at the conclusion of the examination, law enforcement personnel determine that particular files or file folders on the computer and storage media do not contain any data falling within the scope of the warrant, they will not search or examine those files or folders further without authorization from the Court.  Law enforcement personnel may continue to examine files or data falling within the purview of the warrant, as well as data within the operating system, file system, software application, etc., relating to files or data that fall within the scope of the warrant, through the conclusion of the case.

8.      If an examination is conducted, and the computer and storage media do not contain any data falling within the ambit of the warrant, the government will return the computer and storage media to its owner within a reasonable period of time following the search and will seal any image of the computer and storage media, absent further authorization from the Court.

**Attachment B**                                                      **Page 6**

9.      The government may retain the computer and storage media as evidence, fruits, contraband, or an instrumentality of a crime or to commence forfeiture proceedings against the computer and storage media and/or the data contained therein.

10.      The government will retain a forensic image of the computer and storage media for a number of reasons, including proving the authenticity of evidence to be used at trial, responding to questions regarding the corruption of data, establishing the chain of custody of data, refuting claims of fabricating, tampering, or destroying data, and addressing potential exculpatory evidence claims where, for example, a defendant claims that the government avoided its obligations by destroying data or returning it to a third party.

19 - M C - 22

Video

I



19-MC-22

Video

2

